No. 96-541

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 108

MARY IRIS HULSE,

Petitioner and
Appellant,

v.

STATE OF MONTANA,
DEPARTMENT
OF JUSTICE, MOTOR VEHICLE
DIVISION,

Respondent and Respondent.

APPEAL FROM:   District Court of the Thirteenth Judicial District,
In and for the County of Stillwater,
The Honorable Diane G. Barz, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Gary R. Thomas, Thomas Law Office, Red Lodge, Montana

For Respondent:

Joseph P. Mazurek, Attorney General, Tammy K. Plubell,

Assistant Attorney General, Helena, Montana; Douglas Howard,
Columbus Town Attorney, Columbus, Montana


Heard: November 18, 1997
Submitted on Briefs: November 18, 1997

Decided: May 5, 1998
Filed:


_____
Clerk
Justice James C. Nelson delivered the Opinion of the Court

¶1 Defendant Mary Hulse (Hulse) appeals from the Findings of Fact, Conclusions of Law and Order of the Thirteenth Judicial District Court, Stillwater County, denying her petition to reinstate her driving privileges after those were suspended for her refusal to take a breath test pursuant to § 61-8-402, MCA, as well as the court's denial of her motion in limine to exclude evidence concerning the results of field sobriety tests conducted prior to her arrest for driving while under the influence of alcohol. We affirm.

¶2 The sole issue raised on appeal is whether the District Court erred when it denied Hulse's petition to reinstate her driver's license.

FACTUAL AND PROCEDURAL BACKGROUND

¶3 On March 23, 1996, at 7:30 p.m., Officer Patrick Kennedy was patrolling eastbound on Pike Avenue, one of the main streets in Columbus, Montana, when he observed Hulse drive away from the New Atlas Bar. Although it was dark outside, Hulse proceeded westbound on Pike Avenue without her vehicle headlights on. Hulse and Officer Kennedy passed each other about one and one-half blocks later, and Hulse continued driving without her headlights on. In response, Officer Kennedy activated his overhead lights, made a U-turn and drove behind Hulse for approximately two blocks, but Hulse did not stop. Instead Hulse turned onto another street and Officer Kennedy activated his siren. Hulse drove for another one-half block before she turned into the driveway of her friend, a passenger in Hulse's vehicle. Officer Kennedy pulled in behind Hulse and positioned his vehicle to block the driveway.

¶4 Officer Kennedy approached Hulse, identified himself, and informed her he had stopped her because she was driving without her headlights on after dark. Hulse responded that she did have her headlights on. Officer Kennedy asked her to produce her driver's license, registration and proof of insurance. Hulse produced her registration and after several attempts produced her proof of insurance. When Officer Kennedy again asked her for her driver's license, Hulse became agitated. After Officer Kennedy requested her driver's license for the third time, Hulse produced it.

¶5 During this time, Officer Kennedy smelled the odor of alcohol on Hulse's breath and asked her if she had been drinking. Hulse first responded in the negative but later stated she drank one eight-ounce glass of beer. Officer Kennedy asked Hulse to get out of her car and step down to the sidewalk to perform some field sobriety tests. At this time, Officer Kennedy noticed that Hulse's eyes were bloodshot and that she had difficulty walking. He administered three field sobriety tests (the Horizontal Gaze Nystagmus (HGN), the one-legged stand, and the walk-and-turn) and Hulse performed poorly on the tests. After completing the field sobriety tests, Officer Kennedy arrested Hulse for driving under the influence of alcohol (DUI), handcuffed her, and helped her into the back seat of the patrol car.

¶6 Officer Kennedy transported Hulse to the sheriff's office and read her Montana's Implied Consent Law. Officer Kennedy asked Hulse to submit to a breath test, but Hulse refused. As a result, pursuant to § 61-8-402, MCA (1995), Officer Kennedy seized Hulse's driver's license. On March 26, 1996, pursuant to § 61-8-403, MCA (1995), Hulse filed a petition in the Thirteenth Judicial District Court, Stillwater County, asking the court to review the suspension of her driver's license and requesting the court reinstate her driver's license until the court held her license reinstatement hearing. The District Court entered an order temporarily reinstating Hulse's driver's license and set a hearing date for May 20, 1996.

¶7 On May 15, 1996, Hulse filed a motion in limine to exclude Officer Kennedy's testimony concerning the results of the field sobriety tests Hulse performed prior to her arrest, including the Horizontal Gaze Nystagmus (HGN) test. Specifically, Hulse sought to exclude evidence of the field sobriety tests as constituting an illegal search and the HGN test for failing to meet the Daubert criteria for admission of scientific evidence. On May 17, 1996, the State filed an objection to Hulse's motion in limine, arguing that evidence of these field sobriety tests was admissible under Montana law. The District Court did not issue a written order on Hulse's motion in limine. However, on May 20, 1996, at the beginning of the license reinstatement

hearing, the court ruled that "[f]or the record, the Motions in Limine are absolutely denied. They are completely inappropriate for a hearing of this nature[.]"

¶8 Consequently, in addition to testifying about the facts and circumstances surrounding his initial stop and subsequent arrest of Hulse, Officer Kennedy testified as to his administration and evaluation of the field sobriety tests Hulse performed prior to her arrest for driving while under the influence of alcohol. He testified that after completing the basic training course at the Montana Law Enforcement Academy where he received 40 hours of training in the administration and evaluation of the HGN, the one-legged stand, and the walk-and-turn field sobriety tests, he began working as a patrolman for the town of Columbus, Montana, on July 5, 1995. Furthermore, Officer Kennedy described each test and explained in detail his administration of these tests on Hulse as well as his evaluation that she performed poorly on each of the three field sobriety tests.

¶9 On May 29, 1996, after considering the hearing testimony, the District Court entered its findings of fact, conclusions of law and order denying Hulse's petition to reinstate her driver's license and lifting the stay on the suspension of her license. From this order, Hulse appeals.
DISCUSSION

¶10 Did the District Court err when it denied Hulse's petition to reinstate her driver's license?

¶11 Pursuant to § 61-8-403(4)(a), MCA (1995), in a driver's license reinstatement proceeding, a district court is limited to considering whether:
(i) a peace officer had reasonable grounds to believe that the person had been driving or was in actual physical control of a vehicle upon ways of this state open to the public while under the influence of alcohol, drugs, or a combination of the two;
(ii) the person was placed under arrest; and
(iii) the person refused to submit to the test or tests.

¶12 The reasonable grounds requirement set forth in § 61-8-403(4)(a)(i), MCA (1995), is the equivalent of particularized suspicion as defined in § 46-5-401, MCA. Seyferth v. State (1996), 277 Mont. 377, 384, 922 P.2d 494, 498 (citing Anderson v. State (1996), 275 Mont. 259, 263, 912 P.2d 212, 214). Section 46-5-401, MCA, provides:
Investigative stop. In order to obtain or verify an account of the person's presence or conduct or to determine whether to

arrest the person, a peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense. "When a police officer seizes a person, such as in a brief investigatory stop, the Fourth Amendment right against unreasonable searches and seizures applies." Bauer v. State (1996), 275 Mont. 119, 125, 910 P.2d 886, 889. Therefore, because an investigatory stop must be justified by an objective manifestation that the individual stopped "has committed, is committing, or is about to commit an offense," we have adopted a two-part test to evaluate whether a police officer had sufficient cause to stop an individual. First, the State must establish objective data from which an experienced officer can make certain inferences. Second, the State must establish a resulting suspicion that an occupant of a vehicle is, or has been, engaged in wrongdoing or was a witness to criminal activity. Seyferth, 277 Mont. at 384, 922 P.2d at 498; State v. Gopher (1981), 193 Mont. 189, 194, 631 P.2d 293, 296. Therefore, whether particularized suspicion exists is a question of fact dependent on the totality of the circumstances. Anderson, 275 Mont. at 263, 912 P.2d at 214 (citing State v. Reynolds (1995), 272 Mont. 46, 50, 899 P.2d 540, 542-43).

¶13 Next, to determine whether a person was placed under arrest, § 61-8-403(4)(a)(ii), MCA (1995), we must consider whether an officer had the right to make the arrest. Grinde v. State (1991), 249 Mont. 77, 80, 813 P.2d 473, 475. An officer has the right to make an arrest if the arrest is supported by probable cause. Section 46-6-311, MCA. Probable cause for an arrest exists when the facts and circumstances within the arresting officer's personal knowledge are sufficient to warrant a reasonable person to believe that the suspect has committed an offense. Jess v. State Dept. of Justice, MVD (1992), 255 Mont. 254, 261, 841 P.2d 1137, 1141. Additionally, particularized suspicion for a stop can ripen into probable cause to arrest based on the occurrence of facts or incidents after the stop. Jess, 255 Mont. at 261, 841 P.2d at 1141. That is, "an officer who makes an investigative stop is not precluded from making an arrest based on observations made during the stop." Anderson, 275 Mont. at 265, 912 P.2d at 215.

¶14 Finally, if an officer had particularized suspicion which ripened into probable cause to arrest an individual for DUI, the court must determine whether the person refused to submit to a blood alcohol test or tests, § 61-8-403(4)(a)(iii), MCA (1995). Because a presumption of correctness attaches to the State's act of suspending or revoking a driver's license, the driver bears the burden of proving that the suspension or revocation of a driver's license was improper. Jess, 255 Mont. at 259-60, 841 P.2d at 1140. We review a denial of a petition for reinstatement of a driver's licence to determine whether

the district court's findings of fact are clearly erroneous and whether its conclusions of law are correct. Anderson, 275 Mont. at 262, 912 P.2d at 214 (citing Bauer, 275 Mont. at 122, 910 P.2d at 888).

¶15 Hulse argued in the District Court that the second factor under § 61-8-403(4)(a), MCA (1995), was not satisfied because her arrest was not supported by probable cause. As indicated in her notice of appeal, Hulse appeals from the District Court's denial of her petition for reinstatement of driver's license. However, within her appellate briefs, Hulse more specifically argues the impropriety of the District Court's denial of her motion in limine to exclude evidence of the field sobriety test results. Accordingly, we will also review the District Court's denial of Hulse's motion in limine for abuse of discretion. As we have previously stated:
"The purpose of a motion in limine is to prevent the introduction of evidence which is irrelevant, immaterial, or unfairly prejudicial." Accordingly, the authority to grant or deny a motion in limine "rests in the inherent power of the court to admit or exclude evidence and to take such precautions as are necessary to afford a fair trial for all parties." Thus, we will not overturn a district court's grant [or denial] of a motion in limine absent an abuse of discretion.
City of Helena v. Lewis (1993), 260 Mont. 421, 425-26, 860 P.2d 698, 700 (citations omitted). Furthermore, "[t]his Court will uphold the decision of a district court, if correct, regardless of the lower court's reasoning in reaching its decision." Hagan v. State (1994), 265 Mont. 31, 35, 873 P.2d 1385, 1387 (citations omitted).

¶16 In the case at bar, Hulse does not dispute that she refused to submit to a blood alcohol test. However, she does argue that the suspension of her license was improper because her arrest was invalid due to a lack of probable cause. See § 61-8-403(4)(a)(ii), MCA (1995). In this regard, Hulse contends that the District Court abused its discretion when it summarily denied her motion in limine which sought to exclude evidence of the field sobriety tests as constituting an illegal search and the HGN test for failing to meet the Daubert criteria for admission of scientific evidence. Ultimately, Hulse argues that the District Court erred when it denied her petition to reinstate her driver's license.

¶17 The State responds that the District Court's summary denial of Hulse's motion in limine was proper because a license reinstatement hearing is civil in nature, and, therefore, the exclusionary rule does not apply. Additionally, the State contends the motion in limine was not the appropriate mechanism for attacking the foundation of testimony regarding HGN test results.

Alternatively, the State argues that even if the motion in limine was appropriate, the District Court still reached the right result in denying the motion based on current Montana law.

¶18 We will not address the State's arguments concerning the applicability of the exclusionary rule in civil license reinstatement hearings and the impropriety of using a motion in limine to attack the foundation of testimony regarding HGN test results because these arguments are raised for the first time on appeal. See State v. Fuhrmann (1996), 278 Mont. 396, 404, 925 P.2d 1162, 1167 (citing State v. Henderson (1994), 265 Mont. 454, 458, 877 P.2d 1013, 1016). Rather, we will address the merits of Hulse's arguments that the District Court abused its discretion in summarily denying her motion in limine.

¶19 Hulse first argues that field sobriety tests, such as the HGN, the one-legged stand, and the walk-and-turn, which she performed, constitute a search and seizure of an individual within the meaning of both Article II, Section 11 of the Montana Constitution and the Fourth Amendment to the United States Constitution and thereby implicate an individual's right to privacy under Article II, Section 10 of the Montana Constitution. Consequently, Hulse contends that these warrantless searches will only be constitutional if supported by probable cause coupled with exigent circumstances. Hulse asserts that the information Officer Kennedy had at the time he administered the field sobriety tests was insufficient to provide him with probable cause to believe she was driving under the influence of alcohol. Therefore, Hulse argues the tests violated her constitutional right to be free from unreasonable searches and seizures, and, thus, rendered her subsequent arrest invalid as well. As such, Hulse requests that this Court reverse our decision in State v. Purdie (1984), 209 Mont. 352, 680 P.2d 576, wherein we held that the administration of field sobriety tests does not constitute a search under the Montana or federal constitutions. In turn, Hulse suggests we adopt the rule that field sobriety tests constitute a search requiring probable cause as adopted in State v. Nagel (Or. 1994), 880 P.2d 451, and People v. Carlson (Colo. 1984), 677 P.2d 310.

¶20 The State first responds that we should not disrupt current Montana case law holding that field sobriety tests do not constitute a search. See Purdie, 209 Mont. 352, 680 P.2d 576. However, the State asserts in the alternative that if this Court determines that field sobriety tests do constitute a search requiring probable cause, the more stringent standard of probable cause was satisfied at the time Officer Kennedy requested Hulse perform the field sobriety tests. Furthermore, the State suggests that if this Court reverses its holding in Purdie and determines that field sobriety tests constitute a search under the Montana and federal constitutions, we should adopt particularized

suspicion, not probable cause, as the appropriate standard for the permissible administration of field sobriety tests.

¶21 Article II, Section 10 of the Montana Constitution provides that "[t]he right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest." Furthermore, Article II, Section 11 of the Montana Constitution provides:
Searches and seizures. The people shall be secure in their
persons, papers, homes and effects from unreasonable searches
and seizures. No warrant to search any place, or seize any
person or thing shall issue without describing the place to be
searched or the person or thing to be seized, or without probable
cause, supported by oath or affirmation reduced to writing.
Likewise, the Fourth Amendment to the United States Constitution provides:
The right of the people to be secure in their persons,
houses, papers, and effects, against unreasonable searches and
seizures, shall not be violated, and no Warrants shall issue, but
upon probable cause, supported by Oath or affirmation, and
particularly describing the place to be searched, and the persons
or things to be seized.

¶22 In State v. Carlson, we defined a "search" as the use of some means of gathering evidence, such as a visual examination, which infringes upon a person's reasonable expectation of privacy. State v. Carlson (1982), 198 Mont. 113, 119, 644 P.2d 498, 501 (citing United States v. Hartley (U.S.D.C.Fl. 1980), 486 F.Supp. 1348, 1354). Therefore, to determine whether an unlawful search has occurred we must first consider whether the government has intruded into an area where an individual has a reasonable expectation of privacy. State v. Scheetz (Mont. 1997), 950 P.2d 722, 724, 54 St.Rep. 1286, 1288. "Where no reasonable expectation of privacy exists, there is neither a 'search' nor a 'seizure' within the contemplation of the Fourth Amendment of the United States Constitution or Article II, Section 11 of the Montana Constitution." Scheetz, 950 P.2d at 724-25, 54 St.Rep. at 1288. We apply a two-part test to determine whether an individual has a constitutionally protected right of privacy. First, the individual must have either a subjective or an actual expectation of privacy. Second, the individual's expectation of privacy must be viewed by society as reasonable. State v. Solis (1984), 214 Mont. 310, 314, 693 P.2d 518, 520.

¶23 In Purdie, we held that a field sobriety test, as a mere observation of a person's physical behavior, does not constitute a search because an individual lacks any reasonable expectation of privacy in his physical behavior. Purdie, 209 Mont. at 355-56, 680 P.2d at 578. A police officer stopped Purdie as a

part of traffic control at a vehicular accident site. When the officer spoke with Purdie, he smelled alcohol and thereafter observed Purdie drive erratically from the accident site. As a result, the officer pursued Purdie and stopped him. The officer then requested that Purdie exit his vehicle and perform a field sobriety test. Thereafter, the officer arrested Purdie for driving under the influence. Purdie, 209 Mont. at 353, 680 P.2d at 577. In response to Purdie's motion to suppress certain evidence, the District Court ruled that the results of the field sobriety test, a handwriting specimen and the opinions and observations of police officers concerning Purdie's sobriety were admissible. Purdie, 209 Mont. at 354, 680 P.2d at 577.

¶24 After a jury found him guilty of driving under the influence, Purdie appealed, arguing in part that the district court erred in admitting the results of the field sobriety test. Specifically, Purdie asserted that the field sobriety test constituted an illegal warrantless search under the Montana and federal constitutions. Purdie, 209 Mont. at 353-54, 680 P.2d at 578. We disagreed, holding that the administration of field sobriety tests constitutes a mere observation of an individual's physical behavior, and, therefore, does not constitute a search under the Montana or federal constitutions:

[T]his field sobriety test failed to constitute a search protected by either the federal or Montana Constitutions. The officer merely observed appellant's behavior which hardly amounts to an intrusion into his reasonable expectation of privacy. If observed behavior occurs in a place where the defendant knowingly exposes it, then no Fourth Amendment violation occurs.

Purdie, 209 Mont. at 355, 680 P.2d at 578. We explained that like voice and handwriting samples, an individual lacks any reasonable expectation of privacy in his physical behavior. Purdie, 209 Mont. at 355-56, 680 P.2d at 578.

¶25 In addressing search and seizure issues in contexts other than those involving field sobriety tests, we have explained that Montanans are afforded broader privacy protections under Article II, Section 10 of the Montana Constitution than under the Fourth Amendment to the United States Constitution or Article II, Section 11 of the Montana Constitution. See State v. Nelson (1997), 283 Mont. 231, 241-42, 941 P.2d 441, 448. In Nelson, we held that while medical records were not historically protected under the Fourth Amendment's prohibition against unreasonable searches and seizures, these records were protected under Montana's separate constitutional guarantee of privacy because Article II, Section 10 encompassed not only "autonomy privacy" but confidential "informational privacy" as well. Nelson, 283 Mont. at 241-42, 941 P.2d at 448. Therefore, we further held that to give the right

to informational privacy any meaning the right must "at a minimum, encompass the sanctity of one's medical records." Nelson, 283 Mont. at 242, 941 P.2d at 448.

¶26 We explained that, unlike telephone company billing records, medical records fall within the "zone of privacy" protected by Article II, Section 10 of the Montana Constitution. Nelson, 283 Mont. at 242, 941 P.2d at 448. We pointed out the Montana Legislature has recognized that "health care information is personal and sensitive information that if improperly used or released may do significant harm to a patient's interests in privacy and health care or other interests." Nelson, 283 Mont. at 242, 941 P.2d at 448 (quoting § 50-16-502(1), MCA). We concluded that medical records are "quintessentially 'private' and deserve the utmost constitutional protection." Nelson, 283 Mont. at 242, 941 P.2d at 448.

¶27 Nonetheless, we further explained that an individual's privacy rights under Article II, Sections 10 and 11 of the Montana Constitution are not absolute. Nelson, 283 Mont. at 243, 941 P.2d at 449. Likening an investigative subpoena which seeks to discover protected medical records or information to a search warrant, we held that the strictures of the Fourth Amendment and Article II, Section 11 of the Montana Constitution would be satisfied only upon a showing of probable cause that an offense was committed and medical information relating to the offense is in the possession of the person or institution to whom the subpoena is directed. Nelson, 283 Mont. at 243-44, 941 P.2d at 449.

¶28 In light of our recent decision in Nelson recognizing that Article II, Section 10 of the Montana Constitution encompasses "informational privacy," we agree with Hulse that it is appropriate at this time to re-examine our holding in Purdie that field sobriety tests do not constitute a search because an individual lacks any reasonable expectation of privacy in his physical behavior. In contrast to our holding in Purdie, the Colorado Supreme Court in People v. Carlson, stated that an individual has a constitutionally protected privacy interest in the "coordinative characteristics" exposed by the administration of field sobriety tests. Carlson, 677 P.2d at 317. A roadside sobriety test involves an examination and evaluation of a person's ability to perform a series of coordinative physical maneuvers, not normally performed in public or knowingly exposed to public viewing, for the purpose of determining whether the person under observation is intoxicated. Carlson, 677 P.2d at 316.

¶29 The court held that to be constitutionally valid field sobriety tests may

only be administered if an officer had probable cause to arrest a driver for driving under the influence or when a driver voluntarily consents. Carlson, 677 P.2d at 317-18. The court, however, pointed out that an individual driving a vehicle has no legitimate expectation of privacy in his physical traits and demeanor that are in plain sight of a police officer during a valid traffic stop. Carlson, 677 P.2d at 316. The court explained that an officer's observation of an individual's gait upon exiting the vehicle and walking to the rear of the vehicle does not differ from observation of an individual's general physical characteristics, such as height and weight. Carlson, 677 P.2d at 316.

¶30 Similarly, the Oregon Supreme Court held in Nagel that field sobriety tests were searches under both Article I, Section 9 of the Oregon Constitution and under the Fourth Amendment to the United States Constitution. Nagel, 880 P.2d at 457-59. In concluding that these tests were searches under the Fourth Amendment, the Court explained that the administration of field sobriety tests ran counter to an individual's reasonable expectation of privacy for two reasons. First, an individual must perform certain maneuvers not normally performed in public, and, thus, the tests expose to view certain things not otherwise obvious through passive observation of an individual. Nagel, 880 P.2d at 457-58.

Unlike the quality of one's voice or one's handwriting, people do not regularly display that type of behavior to the public--there is no reason to believe that motorists regularly stand alongside a public road reciting the alphabet, count backward from 107, stand upon one leg while counting from 1001 to 1030, or walk a line, forward and back, counting steps and touching heel to toe.

Nagel, 880 P.2d at 457.

Second, an individual has a reasonable expectation of privacy in the information an officer obtains from the field sobriety tests. The court explained that like the chemical analysis of urine, "a field sobriety test may reveal evidence of equally private facts about an individual, including whether the individual is illiterate, has alzheimer's disease, or suffers from multiple sclerosis." Nagel, 880 P.2d at 458 (citing Skinner v. Railway Labor Executives' Assn. (1989), 489 U.S. 602, 617, 109 S.Ct. 1402, 1413, 103 L.Ed.2d 639).

¶31 The court concluded that because constitutionally protected privacy interests are implicated in both the process of conducting the field sobriety tests and in the information disclosed by the tests, these tests constitute a search under the Fourth Amendment to the United States Constitution. Nagel, 880 P.2d at 458. The court held that based on the specific facts in Nagel, the field sobriety tests performed were reasonable; they were administered upon

probable cause to arrest Nagel and under exigent circumstances due to the evanescent nature of evidence of impairment resulting from blood alcohol. Nagel, 880 P.2d at 459. The court declined to address the constitutionality of Oregon's statutory scheme which authorized the administration of field sobriety tests upon less than probable cause. Nagel, 880 P.2d at 459.

¶32 We recognize that law enforcement officers use field sobriety tests as investigative tools to assist them in discovering and arresting persons driving under the influence of alcohol. We agree with the Oregon Supreme Court in Nagel that, as such, field sobriety tests create a situation in which police officers may observe certain aspects of an individual's physical and psychological condition which would not otherwise be observable. See Nagel, 880 P.2d at 455. Just as medical information may be revealed by subpoenaing a person's medical records or through the chemical analysis of a person's urine, so too is certain information concerning an individual's physical and psychological condition potentially revealed through the administration of field sobriety tests. See Nelson, 283 Mont. at 242-44, 941 P.2d at 448-49, and Nagel, 880 P.2d at 457-58. As such, this information falls within the zone of privacy protected by Article II, Section 10 of the Montana Constitution. In contrast, we point out, as did the Colorado Supreme Court in Carlson, that an individual has no reasonable expectation of privacy in his physical characteristics or behavior such as handwriting, speech, height, weight, gait, appearance or smell. See Carlson, 677 P.2d at 316. Therefore, an officer's observation of such physical traits during a valid traffic stop does not constitute a search. See Carlson, 677 P.2d at 316.

¶33 For these reasons, we hold that field sobriety tests are not "merely observations" of a person's physical behavior, but, rather, constitute a search under the Fourth Amendment to the United States Constitution and, independently of the federal constitution, under Article II, Section 11 of the Montana Constitution because an individual's constitutionally protected privacy interests are implicated in both the process of conducting the field sobriety tests and in the information disclosed by the tests. See Nagel, 880 P.2d at 458. Consequently, Purdie, 209 Mont. 352, 680 P.2d 576, and any other Montana case that has held that field sobriety tests are "merely observations" of a person's physical behavior are hereby overruled to that extent.

¶34 Because an individual has a legitimate privacy interest in both the process of conducting the field sobriety tests and in the information revealed by the tests, this privacy interest may not be invaded absent a compelling state interest. Art. II, Sec. 10, Mont.Const. We have explained that "[a] compelling state interest 'exists where the state enforces its criminal laws for the benefit

and protection of other fundamental rights of its citizens.' " Solis, 214 Mont. at 319, 693 P.2d at 522 (quoting State ex rel. Zander v. District Court (1979), 180 Mont. 548, 556, 591 P.2d 656, 660). Montana has a compelling interest to remove drunk drivers from our roadways. This compelling interest is embodied in both § 61-8-401, MCA (prohibiting driving while under the influence of alcohol or drugs), and § 61-8-406, MCA (making driving with an alcohol concentration of 0.10 or more per se illegal), as well as §§ 61-8-714, -722 and -723, MCA (1995) (providing escalating penalties for repeat offenders of §§ 61-8-401 and -406, MCA). Yet even with this compelling state interest, the State may not invade an individual's privacy unless the procedural safeguards attached to the right to be free from unreasonable searches and seizures are met. See Solis, 214 Mont. at 319, 693 P.2d at 522.

¶35 Warrantless searches are per se unreasonable under the Fourth Amendment and Article II, Section 11 of the Montana Constitution; however, both federal and state law recognize certain specific exceptions to the warrant requirement. An investigatory stop is such an exception. State v. Collard (Mont. 1997), 951 P.2d 56, 60, 54 St.Rep. 1366, 1368. In Terry v. Ohio, the United States Supreme Court ruled that an officer's stop and search of an individual may be constitutionally permissible even in the absence of probable cause. Terry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Similarly, in Gopher, we held that "when a trained police officer has a particularized suspicion that the occupant of a vehicle is or has been engaged in criminal activity, or witness thereto, a limited and reasonable investigatory stop and search is justified." Gopher, 193 Mont. at 194, 631 P.2d at 296. See also § 46-5-401, MCA (permitting an officer to make an investigative stop on the basis of particularized suspicion).

¶36 To determine whether a search conducted within an investigatory stop is reasonable, and, therefore, constitutionally permissible, we must balance the state's interest in conducting the search against the level of intrusion into an individual's privacy that the search entails. The United States Supreme Court in Terry held:
[W]here a police officer observes unusual conduct which leads
him reasonably to conclude in light of his experience that
criminal activity may be afoot and that the persons with whom
he is dealing may be armed and presently dangerous, where in
the course of investigating this behavior he identifies himself as
a policeman and makes reasonable inquiries, and where nothing
in the initial stages of the encounter serves to dispel his
reasonable fear for his own or others' safety, he is entitled for
the protection of himself and others in the area to conduct a
carefully limited search of the outer clothing of such persons in

an attempt to discover weapons which might be used to assault him.
Terry, 392 U.S. at 30, 88 S.Ct. at 1884-85, 20 L.Ed.2d 889, 911.

¶37 Relying on the rationale of Terry, the Arizona Supreme Court held in State v. Superior Court that, although searches pursuant to the Fourth Amendment, field sobriety tests may be justified by a police officer's particularized suspicion that an individual was driving while intoxicated. Refusing to adopt the probable cause standard required by the Colorado Supreme Court in Carlson, the Arizona court explained:
[T]he threat to public safety posed by a person driving under the influence of alcohol is as great as the threat posed by a person illegally concealing a gun. If nothing in the initial stages of the stop serves to dispel the highway patrol officer's [particularized] suspicion, fear for the safety of others on the highway entitles him to conduct a "carefully limited search" by observing the driver's conduct and performance of standard, reasonable tests to discover whether the driver is drunk. The battery of roadside sobriety tests is such a limited search. The duration and atmosphere of the usual traffic stop make it more analogous to a so-called Terry stop than to a formal arrest.
State v. Superior Court (Ariz. 1986), 718 P.2d 171, 176 (citation omitted). Many other jurisdictions have similarly held that probable cause is not required before a law enforcement officer administers field sobriety tests. See State v. Taylor (Fla. 1995), 648 So.2d 701; State v. Lamme (Conn.App. 1989), 563 A.2d 1372; State v. Gray (Vt. 1988), 552 A.2d 1190; State v. Stevens (Iowa 1986), 394 N.W.2d 388, cert. denied, 479 U.S. 1057 (1987); State v. Golden (Ga.App. 1984), 318 S.E.2d 693; State v. Wyatt (Haw. 1984), 687 P.2d 544; State v. Little (Me. 1983), 468 A.2d 615.

¶38 We agree with the sound rationale of the Arizona Supreme Court in Superior Court that public safety is equally threatened by a person driving under the influence of alcohol as by a person illegally concealing a gun. See Superior Court, 718 P.2d at 176. Because we recognize that field sobriety tests, like investigative stops, are important investigative tools used by police officers to determine whether probable cause for arrest exists, we also acknowledge that to require probable cause that an individual has been driving under the influence before allowing police officers to administer field sobriety tests would defeat the very purpose of these tests. Therefore, while we agree with the holdings in Carlson and Nagel that field sobriety tests constitute a search, we disagree that to be reasonable, and, therefore, constitutionally permissible, the tests must be supported by probable cause. Rather, we conclude that the State's interest in administering field sobriety tests based

upon particularized suspicion rather than the more stringent standard of probable cause substantially outweighs the resulting limited intrusion into an individual's privacy. Accordingly, we hold that just as an investigative stop must be based upon particularized suspicion to be constitutionally valid under both the Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution, field sobriety tests, as searches, must also be based upon particularized suspicion.

¶39 In this regard, we note that particularized suspicion for the initial stop may also serve as the necessary particularized suspicion for the administration of field sobriety tests, providing the basis for the initial stop was of the nature that would lead an officer to believe that the driver was intoxicated. In other words, if an individual is driving erratically--e.g., if he is driving all over the road, crossing the center line and the fog line, weaving in and out of traffic, or braking for green lights--such evidence would serve as particularized suspicion both for the officer to initially stop the driver and to administer field sobriety tests.

¶40 Likewise, we recognize that investigative stops can take on the quality of an escalating situation. As the Appellate Court of Connecticut explained:
Once a lawful stop is made, a police officer's suspicions may become further aroused and the stop may become further prolonged and the scope enlarged as required by the circumstances, provided the scope of the investigation remains within the limits created by the facts upon which the stop is predicated and the suspicion which they arouse.
Lamme, 563 A.2d at 1374 (citing Terry, 392 U.S. at 21-22, 29, 88 S.Ct. at 1879-81, 1883-84, 20 L.Ed.2d 889). For example, if an officer only observed an individual driving with a broken taillight and after making his initial stop he did not observe any signs of intoxication, he would not have particularized suspicion that the driver was driving under the influence, and, therefore, would be prohibited from administering field sobriety tests. By contrast, if an officer stops a driver for a broken taillight and upon approaching this driver the officer does observe signs of intoxication, e.g., the driver's breath smells of alcohol, his eyes are bloodshot and glassy, or his speech is slurred, the officer would have a separate particularized suspicion that the individual was driving under the influence of alcohol, and, therefore, may administer field sobriety tests. If the driver should fail the field sobriety tests, the officer would then have probable cause to arrest this individual for driving under the influence of alcohol.

¶41 The case at bar is a good example of such an escalating situation, Officer Kennedy first observed Hulse drive away from the New Atlas Bar and

down one of the main streets in Columbus, Montana, without her headlights on after dark in violation of § 61-9-201, MCA. In response, he activated his overhead lights to which she did not respond. After following her for two more blocks, Officer Kennedy activated his siren. Despite Officer Kennedy's actions, Hulse did not stop for another one-half block. This objective data established that Officer Kennedy's initial stop of Hulse was permissible because it was based on a particularized suspicion that Hulse had committed an offense.

¶42 After Hulse pulled into her friend's driveway and stopped, Officer Kennedy approached Hulse, explained his reason for the stop, and asked Hulse to produce her vehicle registration, proof of insurance and driver's license. At this time, Officer Kennedy smelled alcohol on Hulse's breath and observed that her eyes were bloodshot. Additionally, he noted that Hulse had difficulty with her balance when she exited her vehicle. Furthermore, he observed that Hulse had difficulty producing her driver's license. Based on these observations, Officer Kennedy asked Hulse to perform three field sobriety tests. This objective data further established that Officer Kennedy had a separate particularized suspicion that Hulse was driving while under the influence of alcohol, and, therefore, his administration of field sobriety tests was a constitutionally permissible search under the Fourth Amendment to the United States Constitution and under Article II, Section 11 of the Montana Constitution. Because under the totality of the circumstances, the evidence of record is sufficient to support a particularized suspicion, we hold that the District Court's finding that Officer Kennedy had reasonable grounds to believe that Hulse was driving under the influence of alcohol is supported by substantial credible evidence and is not otherwise clearly erroneous. See § 61-8-403(4)(a)(i), MCA (1995).

¶43 Relying on Daubert v. Merrell Dow Pharmaceuticals, Inc. (1993), 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, Hulse next argues that the District Court abused its discretion when it summarily denied her motion in limine and admitted evidence concerning results of the Horizontal Gaze Nystagmus (HGN) test, one of the field sobriety tests she performed at Officer Kennedy's request. Hulse contends that because the HGN is a scientific test, evidence concerning the results of this test are inadmissible unless the requirements of Daubert are met. Hulse maintains that by failing to determine whether, under the Daubert standard, the HGN test results were admissible, the District Court abused its discretion in admitting the HGN test results.

¶44 Consequently, Hulse asserts that without the admission of her HGN tests results, the remaining evidence was insufficient to support a finding that Officer Kennedy had probable cause to arrest her. Hulse, therefore, argues

that because her arrest was invalid, the District Court erred in denying her petition to reinstate her license. In this regard, Hulse asserts that our decision in State v. Clark (1988), 234 Mont. 222, 762 P.2d 853, is confusing as to what foundation is required for the admission of HGN test results. Hulse suggests that in light of our adoption of Daubert, which Hulse maintains is inconsistent with our decision in Barmeyer v. Montana Power Co. (1983), 202 Mont. 185, 657 P.2d 594, overruled on other grounds by Martel v. Montana Power Co. (1988), 231 Mont. 96, 752 P.2d 140, we should clarify our decision in Clark concerning the admissibility requirements of HGN test results.

¶45 The State first responds that Hulse waived her objections concerning the HGN test results because after the District Court denied her motion in limine, Hulse did not renew her objection to Officer Kennedy's testimony concerning her HGN test results and did not attempt to refute his testimony through cross-examination. Alternatively, the State argues that even if Hulse's objections were preserved, the District Court properly denied her motion in limine. The State asserts that the HGN test administered to Hulse is a test with a basis in science that has already been established. The State, therefore, contends that pursuant to Clark, the District Court properly admitted evidence of Hulse's HGN test results because the State demonstrated through Officer Kennedy's testimony that he was properly trained to administer the HGN test and that he in fact administered the test in accordance with such training.

46 At the outset, we agree with Hulse that she preserved for appeal her objections to the admission of the HGN test results by filing a motion in limine specifying the grounds of her objection. See Fuhrmann, 278 Mont. at 403, 925 P.2d at 1166. Because a motion in limine is a pre-trial objection to evidence, a party need not continually renew the objection to preserve alleged errors for appeal. Barrett v. ASARCo, Inc. (1990), 245 Mont. 196, 205, 799 P.2d 1078, 1083-84 (citation omitted). Consequently, because Hulse preserved this issue for appeal, we will address the merits of her arguments.

¶47 We begin with Rule 702, M.R.Evid., to determine whether the District Court properly admitted evidence concerning Hulse's HGN test results. Rule 702, M.R.Evid., identical to its federal counterpart, governs the admissibility of expert testimony:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

¶48 We have stated that "[t]he test for the admissibility of expert testimony

is whether the matter is sufficiently beyond common experience that the opinion of the expert will assist the trier of fact to understand the evidence or to determine a fact in issue." Durbin v. Ross (1996), 276 Mont. 463, 469, 916 P.2d 758, 762 (quoting Jim's Excavating Service v. HKM Assoc. (1994), 265 Mont. 494, 509, 878 P.2d 248, 257 (construing Rule 702, M.R.Evid.)). Furthermore, we have explained:

The Commission Comments to Rule 702, M.R.Evid., note that the rule sets forth two standards. First, the subject matter must be one that requires expert testimony. Expert testimony is required in areas not within the range of ordinary training or intelligence. Second, the particular witness must be qualified as an expert to give an opinion in the particular area of the testimony. Thus, Rule 702, M.R.Evid., implicitly requires a foundation showing that the expert has special training or education and adequate knowledge on which to base an opinion. Within the confines of the rule of evidence, a trial court has broad discretion in determining the admissibility of the evidence.

Durbin, 276 Mont. at, 477-78, 916 P.2d at 767 (citations omitted). In addition to the standards of Rule 702, M.R.Evid., we have imposed additional admissibility requirements upon expert testimony pertaining to scientific evidence.

¶49 In Barmeyer, we addressed the issue of whether the district court properly allowed defendant's expert witness to testify based on his application of "corrosion analysis" that fire arc-marks found on defendant's east-phase conductor existed prior to the date the subject grass and forest fire occurred. Barmeyer, 202 Mont. at 191-92, 657 P.2d at 597. In response to Barmeyer's contention that the district court abused its discretion in admitting the evidence because "corrosion analysis" was not generally accepted or recognized by the scientific community, we held that with the advent of Rule 702, M.R.Evid., which exemplified a trend to liberalize the admission of expert testimony, the Frye "general acceptance" standard was "not in conformity with the spirit of the new rules of evidence." Barmeyer, 202 Mont. at 192-93, 657 P.2d at 598. Agreeing with the philosophy articulated in United States v. Baller (4th Cir. 1975), 519 F.2d 463, cert. denied, 423 U.S. 1019 (1975), we further held:

"Deciding whether these conditions have been met is normally within the discretion of the trial judge. Absolute certainty of result or unanimity of scientific opinion is not required for admissibility. 'Every useful new development must have its first day in court. And court records are full of the conflicting opinions of doctors, engineers, and accountants, to name just a few of the legions of expert witnesses.' Unless an exaggerated

popular opinion of the accuracy of a particular technique makes its use prejudicial or likely to mislead the jury, it is better to admit relevant scientific evidence in the same manner as other expert testimony and allow its weight to be attacked by cross-examination

and refutation."
Barmeyer, 202 Mont. at 193-94, 657 P.2d at 598 (quoting Baller, 519 F.2d at 466). We found in the case sub judice that a sufficient foundation was laid for defendant's expert witness to testify, and, therefore, concluded that the district court did not abuse its discretion. Barmeyer, 202 Mont. at 194, 657 P.2d at 599.

¶50 Thereafter, in Clark, we described appellant's reliance on the Frye general acceptance standard as misplaced and instead relied on Rule 702, M.R.Evid., and Barmeyer, to determine whether the district court properly allowed Clark's arresting officer to testify as to the results of the HGN test performed by Clark prior to his arrest for DUI. Clark, 234 Mont. at 226-28, 762 P.2d at 856-57. Stating the admission of HGN test results was a matter of first impression, we noted that several other states had allowed admission of this evidence as one method of indicating impairment, and "adopt[ed] the position of these courts in allowing the admission of the tests." Clark, 234 Mont. at 226, 762 P.2d at 856 (citing Howard v. State (Tex.App. 1987), 744 S.W.2d 640; Superior Court, 718 P.2d 171; and People v. Vega (1986), 496 N.E.2d 501). We then pointed out, however, that the "pivotal question" was one of proper foundation. Clark, 234 Mont. at 226, 762 P.2d at 856.

¶51 In response to Clark's argument that his arresting officer, Deputy Irby, was not sufficiently qualified to testify as to the scientific reliability of the HGN test, we simply stated that "the scientific reliability was nonetheless discussed through Clark's own witness, Dr. Curt Kurtz." We thereafter set forth a portion of Dr. Kurtz's testimony concerning various causes, including alcohol, of nystagmus and its use by police as an indicator of intoxication. Clark, 234 Mont. at 227, 762 P.2d at 857. We affirmed the district court's admission of the HGN test results, concluding:
Upon the testimony of Dr. Kurtz, the District Court found sufficient basis for the admissibility of the HGN test. This Court has long held it is within the jurisdiction of the trial judge to admit scientific and expert testimony. State v. Sharbono (1977), 175 Mont. 373, 384, 563 P.2d 61, 68. As to the results of the test, Deputy Irby testified he was certified through the Montana Law Enforcement Academy, completing the required number of training hours. Further Deputy Irby testified he administered the test in the proper

manner. No other foundation need be shown.
Clark, 234 Mont. at 227-28, 762 P.2d at 857.


¶52 Subsequent to our decisions in Barmeyer and Clark, the United States Supreme Court also rejected the Frye general acceptance standard for admissibility of expert testimony concerning novel scientific evidence in response to the liberalized requirements of Rule 702, F.R.Evid. Daubert, 509 U.S. at 588-90, 113 S.Ct. at 2794-95, 125 L.Ed.2d at 479-81. The Supreme Court explained that a trial court is required under Rule 702, F.R.Evid., to screen this evidence to ensure not only its relevancy, but its reliability. Daubert, 509 U.S. at 589, 113 S.Ct. at 2795, 125 L.Ed.2d at 480. To assist trial courts, the Supreme Court set forth several non-exclusive factors for consideration which we adopted:
(a) whether the theory or technique can be and has been tested;
(b) whether the theory or technique has been subjected to peer review and publication; (c) the known or potential rate of error in using a particular scientific technique and the existence and maintenance of standards controlling the technique's operation; and (d) whether the theory or technique has been generally accepted or rejected in the particular scientific field.
State v. Moore (1994), 268 Mont. 20, 41, 885 P.2d 457, 470-71 (citing Daubert, 509 U.S. at 592-95, 113 S.Ct. at 2796-98, 125 L.Ed.2d at 482-84).


¶53 We adopted the rationale of Daubert in Moore to determine whether the district court properly admitted DNA analysis evidence. We first explained that we had previously rejected the Frye general acceptance test because "[i]n determining whether to allow expert testimony concerning novel scientific evidence, this Court has held that 'it is better to admit relevant scientific evidence in the same manner as other expert testimony and allow its weight to be attacked by cross-examination and refutation.' " Moore, 268 Mont. at 41, 885 P.2d at 470 (quoting Barmeyer, 202 Mont. at 193-94, 657 P.2d at 598). We concluded that the guidelines set forth in Daubert were consistent with our previous holding in Barmeyer concerning the admission of expert testimony of novel scientific evidence. Moore, 268 Mont. at 42, 885 P.2d at 471. As such, we further concluded that "before a trial court admits scientific expert testimony, there must be a preliminary showing that the expert's opinion is premised on a reliable methodology." Moore, 268 Mont. at 42, 885 P.2d at 471. However, we explained that the trial court must be flexible in this inquiry. Moore, 268 Mont. at 42, 885 P.2d at 471.


¶54 Thereafter, we again applied the Daubert standard in State v. Cline (1996), 275 Mont. 46, 909 P.2d 1171, to determine the admissibility of expert testimony concerning the age of the defendant's fingerprint. Citing Moore, we

again pointed out the "continuing vitality of Barmeyer." Cline, 275 Mont. at 55, 909 P.2d at 1177. Additionally, before reviewing the district court's decision to admit this evidence under the Daubert standard, we explained:

It must also be noted that we do not consider fingerprint evidence in general to be novel scientific evidence. However, in the present case the issue is whether it is possible to determine the age of a fingerprint utilizing magnetic powder. We apply the Daubert standard to this case because we consider fingerprint aging techniques in this context to be novel scientific evidence. Certainly all scientific expert testimony is not subject to the Daubert standard and the Daubert test should only be used to determine the admissibility of novel scientific evidence. Cline, 275 Mont. at 55, 909 P.2d at 1177.

¶55 We agree with Hulse that in light of this subsequent case law, the required foundation for admission of HGN test results, as set forth in Clark, is less than clear. As is evident from our case law, while Rule 702, M.R.Evid., generally governs the admission of expert testimony, we have imposed an additional admissibility requirement upon expert testimony concerning "novel" scientific evidence, such as DNA analysis and fingerprint aging techniques. See Moore, 268 Mont. at 41, 885 P.2d at 470, and Cline, 275 Mont. at 55, 909 P.2d at 1177. Hulse suggests that Daubert is not limited to the admissibility of "novel" scientific evidence and that Barmeyer and Daubert are inconsistent. We disagree. Accordingly, we take this opportunity to clarify our decision in Clark concerning the admissibility requirements of HGN test results and to clarify the admissibility requirements of scientific evidence in general.

¶56 First, as is clearly stated in Cline, "all scientific expert testimony is not subject to the Daubert standard and the Daubert test should only be used to determine the admissibility of novel scientific evidence." Cline, 275 Mont. at 55, 909 P.2d at 1177. Such a conclusion is supported by the language of Daubert itself. The issue in Daubert concerned the admissibility of a novel scientific theory that birth defects were caused when pregnant women ingested Benedectin, an anti-nausea drug. The Supreme Court noted that although Rule 702, F.R.Evid., also applied to technical or other specialized knowledge, its discussion was limited to the scientific context due to the nature of the expertise at issue. Daubert, 509 U.S. at 590 n.8, 113 S.Ct. at 2795, 125 L.Ed.2d at 481.

¶57 Additionally, the Supreme Court explained that while Frye focused exclusively on novel scientific techniques, the Court did not "read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence." Daubert, 509 U.S. at 592 n.11, 113 S.Ct. at 2796, 125 L.Ed.2d

at 482. The Ninth Circuit Court of Appeals, after citing to this part of the Daubert decision, concluded that the requirements of Daubert "apply to all proffered expert testimony--not just testimony based on novel scientific methods or evidence." Claar v. Burlington Northern Railroad Co. (9th Cir. 1994), 29 F.3d 499, 501 n.2 (citing Daubert, 113 S.Ct. at 2796 n.11). We disagree with this interpretation of Daubert and reassert our holding in Cline that the Daubert test should only be used to determine the admissibility of novel scientific evidence. Cline, 275 Mont. at 55, 909 P.2d at 1177.

¶58 Other jurisdictions have similarly held that Daubert is limited to novel scientific evidence. Recently, a federal district court concluded that "Fed.R.Evid. 702 is still viable and the principles enunciated in Daubert should be narrowly limited to controversial and novel scientific evidence." Thornton v. Caterpillar, Inc. (D.S.C. 1997), 951 F.Supp. 575, 578 (holding that mechanical engineer's testimony concerning design defect and lack of adequate warning fell within technical and specialized knowledge, "not within the narrowly limited area of unique, untested and novel scientific evidence as enunciated in Daubert"). See Waitek v. Dalkon Shield Claimants Trust (N.D.Iowa 1996), 934 F.Supp. 1068, 1087-89 n.10 (providing an extensive list of federal courts so holding)(concluding in the case sub judice that Daubert did not apply to a gynecologist's expert testimony because his opinions "were not based on a novel scientific test or a unique, controversial methodology or technique; rather, he based his opinions on his experience and training as both a gynecologist and as a doctor experienced in the use of and medical problems associated with the Dalkon Shield"). See also Williams v. Hedican (Iowa 1997), 561 N.W.2d 817, 825-27 (concluding, in dicta, that the approach taken in Thornton and other federal courts restricting Daubert in favor of a conventional Rule 702 analysis was reasonable); Collins v. Commonwealth (Ky. 1997), 951 S.W.2d 569, 574-75 (concluding that although the court previously adopted the Daubert analysis, Daubert was not triggered because the doctor's expert testimony concerned basic female anatomical findings that "did not involve any novel scientific techniques or theories"); and State v. Hodgson (Minn. 1994), 512 N.W.2d 95, 98 (acknowledging that Minnesota follows the Frye test and declining to address the impact of Daubert because the issue sub judice involved the expert testimony of a forensic odontologist concerning bite mark analysis which was not a novel or emerging type of scientific evidence).

¶59 Furthermore, we clearly stated in Moore, and reiterated in Cline, that Barmeyer remains viable in light of our adoption of Daubert. In Moore, we stated that Barmeyer set forth the standard for admitting novel scientific evidence, and as such it was consistent with the guidelines set forth in Daubert. Moore, 268 Mont. at 41-42, 885 P.2d at 470-71. We recognize that

Moore, as written, creates a source of confusion concerning the applicability of Barmeyer. Certainly, our statement in Moore that Barmeyer applies when determining the admissibility of novel scientific evidence is correct. However, upon review, we conclude that such a statement interprets Barmeyer too restrictively.

¶60 In Barmeyer, we were presented with the issue of whether the district court abused its discretion by admitting expert testimony which the plaintiff asserted was not generally accepted by the scientific community. It was within this context that we chose to demonstrate the more liberal trend apparent in the rules of evidence by rejecting the Frye general acceptance standard. Barmeyer, 202 Mont. at 193, 657 P.2d at 598. We never expressly characterized the expert testimony at issue as "novel" scientific evidence, but rather we addressed the issue as framed by the appellant in the context of the Frye general acceptance standard. As such, we rejected Frye, and approached the issue under a conventional Rule 702 analysis. Barmeyer, 202 Mont. at 192-94, 657 P.2d at 598-99.

¶61 Consequently, Barmeyer should not be read as applying only to novel scientific evidence. Rather, our statements in Barmeyer more broadly referenced the entire trend to liberalize the admission of expert testimony as it applied to scientific evidence in general. Thus, we held, "it is better to admit relevant scientific evidence in the same manner as other expert testimony and allow its weight to be attacked by cross-examination and refutation." Barmeyer, 202 Mont. at 193-94, 657 P.2d at 598. The United States Supreme Court set forth this same principle in Daubert.

¶62 The Court, in Daubert, addressed concerns regarding the consequences of abandoning the Frye general acceptance test, by explaining that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596, 113 S.Ct. at 2798, 125 L.Ed.2d at 484. The Court went on to state that "[t]hese conventional devices, rather than wholesale exclusion under an uncompromising 'general acceptance' test, are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702." Daubert, 509 U.S. at 596, 113 S.Ct. at 2798, 125 L.Ed.2d at 485.

¶63 Although Daubert was limited to "novel" scientific evidence, this rationale is wholly consistent with our decision in Barmeyer concerning the admissibility of scientific evidence in general. That is, a trial court, presented with scientific evidence, novel or not, is encouraged to liberally construe the rules of evidence so as to admit all relevant expert testimony pursuant to

Barmeyer. Certainly, if a court is presented with an issue concerning the admissibility of novel scientific evidence, as was the case in both Moore and Cline, the court must apply the guidelines set forth in Daubert, while adhering to the principle set forth in Barmeyer. However, if a court is presented with an issue concerning the admissibility of scientific evidence in general, the court must employ a conventional analysis under Rule 702, M.R.Evid., while again adhering to the principle set forth in Barmeyer.

¶64 With this in mind, we now turn to the more immediate issue concerning the foundation requirements for admission of HGN test results. The State point outs that throughout other jurisdictions, three different lines of cases concerning the admissibility of HGN test results have evolved. The first line of cases, relying in part on the seminal case of Superior Court, 718 P.2d 171, conclude that the scientific reliability of the HGN test has been established and does not require expert testimony in every case. Another line of cases holds that the HGN test is not scientific, and, therefore, does not require expert testimony as a foundation for admissibility. Finally, a third line of cases holds that before HGN test results are admitted, expert testimony must demonstrate general acceptance in the relevant scientific community. See City of Fargo v. McLaughlin (N.D. 1994), 512 N.W.2d 700, 705-06 (extensively listing states representative of each of these three lines of cases). See also Commonwealth v. Sands (Mass. 1997), 675 N.E.2d 370, 372-73 (listing states that have admitted HGN test results under Frye, Daubert, or a rule equivalent to Rule 702, F.R.Evid.).

¶65 In Montana, we recognize the scientific basis underlying the HGN test requiring expert testimony. See Clark, 234 Mont. at 226-28, 762 P.2d at 856-57. However, the issue raised today is whether the District Court abused its discretion when it allowed Officer Kennedy to testify as to Hulse's HGN test results without first determining whether the requirements of Daubert were met. Accordingly, to decide whether Daubert should be applied to determine the admissibility of HGN test results, we must first determine whether the HGN test is novel scientific evidence.

¶66 Nystagmus is the involuntary jerking of the eyeball resulting from the body's attempt to maintain balance and orientation. State v. Murphy (Tenn. 1997), 953 S.W.2d 200, 202. Nystagmus may be aggravated by central nervous system depressants such as alcohol or barbiturates. Superior Court, 718 P.2d at 173. See Schultz v. State (Md.App. 1995), 664 A.2d 60, 77 (listing 38 possible causes of nystagmus, other than alcohol). Furthermore, the inability of the eyes to maintain visual fixation as they are turned to the side is known as horizontal gaze nystagmus. Superior Court, 718 P.2d at 173. The HGN test consists of three parts which measure

various aspects of these involuntary movements which cause nystagmus. In the first part, the "smooth pursuit" test, the officer asks the defendant to first look straight ahead, focusing on an object, such as a pen, which the officer then moves back and forth horizontally. As the driver follows the path of the pen, the officer looks to see whether the eyes move smoothly from side to side, or whether they exhibit nystagmus, characterized by an unsteady, bouncing movement. In the second part, the "maximum deviation" test, the officer moves the pen horizontally to the limit of the driver's field of vision, and watches the eyes for bouncing at the extremes. In the third part, the "forty-five degree" test, the officer again moves the object from side to side, asking the driver to follow the movement with his eyes. The officer watches for the onset of the nystagmus prior to a forty-five degree angle between the driver's nose and the position of the object. The underlying theory is that there is a strong correlation between the degree of a person's intoxication and the angle at which the person's eyes begin to exhibit evidence of nystagmus.
Sands, 675 N.E.2d at 372 (citation omitted).

¶67 As the Kansas Supreme Court effectively explained, the HGN test is a scientific test:
The HGN test is distinguished from other field sobriety tests in that science, rather than common knowledge, provides the legitimacy for HGN testing. Certain reactions to alcohol are so common that judicial notice will be taken of them; however, HGN testing does not fall into this category. HGN test results are "scientific evidence based on the scientific principle that consumption of alcohol causes the type of nystagmus measured by the HGN test." HGN evidence could have a disproportionate impact on the jury's decision[-]making process because of the test's scientific nature and because the jury may not understand the nature of the test or the methodology of its procedure.
State v. Witte (Kan. 1992), 836 P.2d 1110, 1115 (citing in part Superior Court, 718 P.2d 171; other citations omitted).

¶68 Law enforcement officials have used the HGN test for several decades. See John P. Ludington, Annotation, Horizontal Gaze Nystagmus Test: Use In Impaired Driving Prosecution, 60 A.L.R. 4th 1129, 1131 (1988). In this regard, as indicated by Officer Kennedy's testimony, the Montana Law Enforcement Academy trains officers in HGN testing. Additionally, appellate courts throughout the country began addressing the admissibility of HGN test

results as early as 1986. See Superior Court, 718 P.2d 171. The Minnesota Supreme Court has commented that the HGN test "can hardly be characterized as [an] emerging scientific technique[ ]" because nystagmus has long been known and the tests have been in common medical use for many years. State v. Klawitter (Minn. 1994), 518 N.W.2d 577, 584. Similarly, a Florida appellate court declared that HGN testing was neither a novel nor a new scientific technique. State v. Meador (Fla.App. 4 Dist. 1996), 674 So.2d 826, 835. See also State v. O'Key (Or. 1995), 899 P.2d 663, 684 (noting HGN test used for three decades).

¶69 We agree that the HGN test is not novel scientific evidence. Therefore, to determine the admissibility of HGN test results, a district court need not employ the Daubert standard. However, we continue to recognize that the relationship between alcohol consumption and nystagmus, the underlying scientific principle of the HGN test, is still beyond the range of ordinary training or intelligence. Therefore, a district court must still conduct a conventional Rule 702, M.R.Evid., analysis to determine the admissibility of HGN test results while adhering to the principle of Barmeyer.

¶70 Rule 702, M.R.Evid., "implicitly requires a foundation showing that the expert has special training or education and adequate knowledge on which to base an opinion." Durbin, 276 Mont. at 477-78, 916 P.2d at 767 (citation omitted). As our decision in Clark illustrates, before an arresting officer may testify as to HGN test results, a proper foundation must show that the officer was properly trained to administer the HGN test and that he administered the test in accordance with this training. Clark, 234 Mont. at 228, 762 P.2d at 857. However, Clark also illustrates that a foundation showing that the arresting officer is qualified to testify as to the HGN test results does not provide a sufficient basis for the officer to testify as to the scientific basis of the HGN test. In response to Clark's argument that his arresting officer was not sufficiently qualified to testify as to the scientific reliability of the HGN test, we stated that "the scientific reliability was nonetheless discussed through Clark's own witness, Dr. Curt Kurtz." Clark, 234 Mont. at 227, 762 P.2d at 857. Consequently, we concluded through the testimony of both Clark's arresting officer as well as the testimony of Clark's witness, Dr. Kurtz, there was a sufficient foundation for the district court to admit evidence of the HGN test results. Clark, 234 Mont. at 227-28, 762 P.2d at 857.

¶71 In the case at bar, after the District Court summarily denied Hulse's motion in limine, Officer Kennedy testified that he had completed the basic training course at the Montana Law Enforcement Academy where he received 40 hours of training in the administration and evaluation of three field sobriety tests, including the HGN test. Thereafter, he described his administration and

evaluation of the HGN test and testified that Hulse failed the HGN test. No testimony was presented either through Officer Kennedy or another expert witness describing the underlying scientific basis of the HGN test other than Officer Kennedy's explanation that everyone's eye will exhibit nystagmus at "maximum deviation," but that "[w]ith the introduction of alcohol into the system, that nystagmus becomes more prevalent and it doesn't cease . . .."

¶72 This testimony shows that Officer Kennedy was trained to administer the HGN test and, in fact, administered the HGN test on Hulse in accordance with this training, and, therefore, he was qualified to testify as to both his administration of the HGN test and his evaluation of Hulse's performance. However, nothing in the evidence establishes that Officer Kennedy had special training or education nor adequate knowledge qualifying him as an expert to explain the correlation between alcohol consumption and nystagmus, the underlying scientific basis of the HGN test. Accordingly, we conclude there was insufficient foundation for the admission of evidence concerning the HGN test and the District Court abused its discretion when it summarily denied Hulse's motion in limine and allowed Officer Kennedy to testify as to Hulse's HGN test results.

¶73 However, even without evidence of the HGN test results, sufficient evidence remains to support a finding that Officer Kennedy had probable cause to arrest Hulse for driving under the influence, and, therefore, that Hulse's arrest was valid. Officer Kennedy testified that he observed Hulse driving way from the New Atlas Bar after dark with her headlights off and that she failed to immediately pull over after he activated his overhead lights and siren. Additionally, after Hulse stopped, Officer Kennedy testified that her eyes were bloodshot, she smelled of alcohol and she fumbled for her driver's license. Furthermore, Officer Kennedy testified that Hulse failed the other two field sobriety tests he administered. Consequently, we further conclude that, although the District Court abused its discretion when it allowed Officer Kennedy to testify about Hulse's HGN test results, this error was harmless. Accordingly, we hold that the District Court's finding that Hulse was arrested is based on substantial evidence, and, thus, is not clearly erroneous. See § 61-8-403(4)(a)(ii), MCA (1995).

¶74 In sum, we hold that the District Court's findings that Officer Kennedy had reasonable grounds to believe that Hulse was driving under the influence of alcohol and that Officer Kennedy had probable cause to arrest Hulse for DUI are supported by substantial credible evidence and are not otherwise clearly erroneous. See §§ 61-8-403(4)(a)(i) and (ii), MCA (1995). Furthermore, Hulse concedes that she refused to submit to a breath test. See § 61-8-403(4)(a)(iii), MCA (1995). Therefore, we further hold that the

District Court correctly concluded that Hulse's driver's license was lawfully suspended pursuant to § 61-8-402, MCA. Accordingly, we affirm the District Court's denial of Hulse's petition to reinstate her driver's license.

¶75 Affirmed.

/S/ JAMES C. NELSON


We Concur:

/S/ J. A. TURNAGE
/S/ WILLIAM E. HUNT, SR.
/S/ JIM REGNIER
/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ TERRY N. TRIEWEILER