No. 04-294

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 218

STATE OF MONTANA,

Plaintiff and Respondent,

v.

DAVID DAMON,

Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and for the County of Cascade, Cause No. CDC 2002-542,
The Honorable Kenneth R. Neill, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Vince van der Hagen (argued), Public Defender, Great Falls, Montana

For Respondent:

Hon. Mike McGrath, Attorney General; John Paulson (argued),
Assistant Attorney General, Helena, Montana

Brant Light, Cascade County Attorney; Marty Judnich, Deputy County
Attorney, Great Falls, Montana

For Amicus Curiae:

Jeffrey T. Renz, Director, Criminal Defense Clinic, School of Law,
Missoula, Montana

Argued:   May 2, 2005
Submitted: May 10, 2005
Decided:   September 6, 2005

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1     We once again address the issue of whether the State may admit the results of a defendant's Preliminary Breath Test (PBT) as substantive evidence at trial.  We earlier held in *State v. Strizich* (1997), 286 Mont. 1, 952 P.2d 1365, *State v. Weldele*, 2003 MT 117, 315 Mont. 452, 69 P.3d 1162, and *State v. Snell*, 2004 MT 334, 324 Mont. 173, 103 P.3d 503, that the State had failed to prove the PBT's statistical reliability and therefore rejected it as substantive evidence.  The Eighth Judicial District Court, Cascade County, found in this case, however, that the State had presented sufficient evidence supporting the reliability of the PBT to permit the results of David Damon's (Damon) PBT as substantive evidence at his trial along with two statements that he made to law enforcement.  Damon appeals from these rulings and from the District Court's sentence designating him as a persistent felony offender.  We agree that the State met its burden in this case and affirm the District Court in all respects.

¶2     We address the following issues on appeal:

¶3     1. Whether the District Court abused its discretion in determining that Damon's PBT result proved sufficiently reliable to be worthy of admission as substantive evidence at trial.

¶4     2. Whether the District Court abused its discretion in admitting evidence of certain statements that Damon made to police during an investigatory stop in spite of the officer's failure to recite the advisories required by § 46-5-402(4), MCA (2001).

¶5     3. Whether the District Court's designation of Damon as a persistent felony offender fell within the parameters set by statute.

**BACKGROUND**

¶6    A law enforcement officer allegedly observed Damon driving erratically in the evening hours of December 9, 2002, and pulled him over. As the officer approached Damon's vehicle, Damon opened his door and began explaining his erratic driving. The officer noticed Damon's slurred speech and detected a strong odor of alcohol. The officer conducted a series of field sobriety tests. During the course of these tests, Damon blurted out "just give me a DUI," and "I'm already drunk." The officer then administered a PBT, also known as a Preliminary Alcohol Screening Test (PAST), that revealed Damon's blood alcohol content (BAC) to be 0.274. The officer took Damon to the police station where his belligerent behavior prevented officers from administering a second breath test with the station's non-portable instrument.

¶7    The State charged Damon with the following offenses: driving under the influence of alcohol (DUI), fourth or subsequent offense, a felony (Count I); driving while privilege to do so is suspended or revoked, a misdemeanor (Count II); no insurance, a misdemeanor (Count III); and disorderly conduct, a misdemeanor (Count IV). The prosecutor timely filed a notice of intent to treat Damon as a persistent felony offender, based on Damon's previous felony DUI conviction of January 14, 1999.

¶8    The District Court held a hearing on August 7, 2003, and October 8, 2003, to determine whether the results from Damon's PBT would be admissible at trial. The State and Damon presented expert testimony on this issue. The District Court issued a written order on November 26, 2003, finding the results of the PBT at issue, the Alco-Sensor III, to be sufficiently reliable and accurate as an evidentiary tool and allowing the State to introduce the evidence at Damon's trial.

3

¶9    Damon moved to suppress various statements that he had made that the police officer recorded on videotape during the investigatory stop based on the officer's alleged failure to advise him as to the nature of the stop pursuant to the now-repealed § 46-5-402(4), MCA (2001). The District Court granted Damon's motion in part and the court ultimately required the State to excise certain statements from the audio of the tape, but allowed to remain Damon's statements to police "just give me a DUI," and "I'm already drunk."

¶10    The District Court held Damon's trial on December 8, 2003, and December 9, 2003. The jury convicted Damon and the court sentenced him on March 10, 2004. The District Court sentenced Damon to ten years, with five years suspended, on the felony DUI charge and also designated him to be a persistent felony offender.

¶11    Damon appeals from the court's evidentiary rulings and the court's designation of him as a persistent felony offender.

## STANDARD OF REVIEW

¶12    This Court reviews rulings on the admissibility of evidence, including oral testimony, under an abuse of discretion standard. *Snell*, ¶ 17. We leave the determination of the relevancy and admissibility of evidence to the sound discretion of the trial judge and we will not overturn it absent a showing of abuse of discretion. *Snell*, ¶ 17. We review criminal sentences for legality; that is, we determine whether a sentence falls within statutory parameters. *State v. Webb*, 2005 MT 5, ¶ 8, 325 Mont. 317, ¶ 8, 106 P.3d 521, ¶ 8; *State v. Eaton*, 2004 MT 283, ¶ 11, 323 Mont. 287, ¶ 11, 99 P.3d 661, ¶ 11.

## DISCUSSION

### ISSUE ONE

4

¶13    Whether the District Court abused its discretion in determining that Damon's PBT result proved sufficiently reliable to be worthy of admission as substantive evidence at trial.

¶14    Damon's sole argument rests on his claim that the District Court abused its discretion in concluding that the PBT used in this case, the Alco-Sensor III, is scientifically reliable. Damon contends that the Alco-Sensor III cannot determine accurately a person's BAC as used by police officers in field conditions. Damon relies on several earlier decisions addressing this same issue, including *Strizich*, *Weldele*, and *State v. Crawford*, 2003 MT 118, 315 Mont. 480, 68 P.3d 848. Damon specifically admitted during oral argument, however, that he had not challenged the procedures followed by the officer who administered the test. He further conceded that he had not challenged the efficacy of the administrative regulations followed by the officer in administering the PBT.

¶15    The State contends it presented extensive expert testimony and evidence to the District Court regarding the reliability of the Alco-Sensor III. The State further maintains that the field protocols used by the administering officer in this case cure any reliability problems.

¶16    Rule 702, M.R.Evid., which is identical to its federal counterpart, governs the admissibility of expert testimony. Rule 702 provides that if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

¶17    In *Barmeyer v. Montana Power Co.* (1983), 202 Mont. 185, 657 P.2d 594, *overruled on other grounds by Martel v. Montana Power Co.* (1988), 231 Mont. 96, 103, 752 P.2d 140,

145, this Court explained that "it is better to admit relevant scientific evidence in the same manner as other expert testimony and allow its weight to be attacked by cross-examination and refutation." *Barmeyer*, 202 Mont. at 193-94, 657 P.2d at 598 (citation omitted). *Barmeyer* remains the law today. *See State v. Southern*, 1999 MT 94, ¶ 56, 294 Mont. 225, ¶ 56, 980 P.2d 3, ¶ 56.

¶18 Ten years after we decided *Barmeyer*, the United States Supreme Court, in *Daubert v. Merrell Dow Pharms., Inc*. (1993), 509 U.S. 579, 593-94, 113 S.Ct. 2786, 2796-97, 125 L.Ed.2d 469, set forth various factors to guide trial courts assessing the reliability of proffered scientific expert testimony. We have held, however, that the district court's gatekeeper role established by *Daubert* applies only to the admission of *novel* scientific evidence in Montana. *See State v. Moore* (1994), 268 Mont. 20, 42, 885 P.2d 457, 471, *overruled on other grounds by State v. Gollehon* (1995), 274 Mont. 116, 121, 906 P.2d 697, 701. We have assessed novelty from a very narrow perspective. For instance, in *State v. Hocevar*, 2000 MT 157, ¶ 56, 300 Mont. 167, ¶ 56, 7 P.3d 329, ¶ 56, we held that expert testimony regarding Munchausen Syndrome by Proxy to be "neither novel nor scientific" and therefore not subject to a *Daubert* analysis. We similarly held that the results of the horizontal gaze nystagmus (HGN) field sobriety test did not constitute novel scientific evidence in *Hulse v. State, Dept. of Justice*, 1998 MT 108, ¶ 69, 289 Mont. 1, ¶ 69, 961 P.2d 75, ¶ 69, thereby making the *Daubert* factors inapplicable in determining whether HGN test results could be admitted as substantive evidence.

¶19 Thus, we have encouraged a trial court, presented with scientific evidence, novel or otherwise, to construe liberally the rules of evidence so as to admit all relevant expert

6

testimony pursuant to *Barmeyer*. *Hulse*, ¶ 63. The court must employ a conventional analysis under Rule 702, M.R.Evid., when a party presents an issue concerning the admissibility of scientific evidence in general. The preference of liberal admissibility subject to stringent cross-examination set forth in *Barmeyer* applies. The State seeks to admit scientific evidence in the form of Damon's PBT result. Under Rule 702, M.R.Evid., if such scientific evidence will assist the trier of fact to determine a fact in issue, a qualified expert witness may testify about it. *State v. Sandrock*, 2004 MT 195, ¶ 27, 322 Mont. 231, ¶ 27, 95 P.3d 153, ¶ 27.

¶20 We do not operate on a clean slate, however, with respect to whether PBT results can be admitted as substantive evidence of guilt. In *Strizich*, we concluded that PBT results did not constitute substantive evidence of the amount of alcohol present in a person's body, but instead represented an "estimate" of alcohol concentration for the purposes of establishing probable cause to believe that a person was under the influence of alcohol prior to making an arrest. *Strizich*, 286 Mont. at 12, 952 P.2d at 1372. We based this holding on the statutory language of § 61-8-404, MCA (1995), and § 61-8-409, MCA (1995), neither of which specifically provided that results of a PBT would be admissible as substantive evidence of guilt. *Strizich*, 286 Mont. at 11-12, 952 P.2d at 1371. We also questioned, however, the reliability of the PBT in the field due to testing procedures and officer error. *Strizich*, 286 Mont. at 12, 952 P.2d at 1372.

¶21 The Legislature amended § 61-8-404, MCA (1995), while *Strizich* was on appeal to this Court, to allow for the admission of PBT results as substantive evidence at trial. *See* § 61-8-404(b)(i), MCA. Though mindful of the Legislature's intent in seeking to broaden the

7

scope of potentially admissible evidence, we remain the final arbiter of questions regarding the ultimate admissibility of evidence. *See City of Missoula v. Robertson*, 2000 MT 52, ¶ 55, 298 Mont. 419, ¶ 55, 998 P.2d 144, ¶ 55. Thus, in *Weldele*, we deemed the defendant's PBT result of 0.154 to be inadmissible as substantive evidence based on the State's failure to prove its statistical reliability. *Weldele*, ¶¶ 57-58. Nevertheless, we upheld Weldele's DUI conviction based on our conclusion that the admission of the PBT results constituted harmless error as substantial other evidence confirmed Weldele's intoxication. *Weldele*, ¶ 59. We explained, however, that our holding did not represent a blanket prohibition of PBT evidence at trial. In fact, we declared that if the State "establishes that the PBT results it seeks to admit are reliable and accurate, the results could then be admissible if they otherwise satisfy all other requirements for admissibility." *Weldele*, ¶ 57; *see also Crawford*, ¶ 13 (holding defendant's PBT result of 0.153 to be inadmissible as substantive evidence based on the State's failure to prove its reliability).

¶22    More recently in *Snell*, the district court allowed admission of a PAST result of 0.168 pursuant to Rule 702, M.R.Evid. *Snell*, ¶ 37. We did not apply the *Daubert* factors in assessing admissibility. We determined instead that any variables in the testing went to the weight of the PAST evidence, rather than its admissibility. *Snell*, ¶ 37. We concluded that the State had failed to offer new evidence that demonstrated the reliability of the Alco-Sensor III and consequently held that the State had not established sufficiently the accuracy and reliability of the PAST results so as to use the results for more than probable cause purposes. *Snell*, ¶ 37.

¶23    Both parties in this case admit that the scientific technology used in the Alco-Sensor

8

III to measure alcohol represents nothing new or novel. The instrument itself has existed since the 1970's. An Austrian scientist initially discovered the fuel cell technology used in the Alco-Sensor III PBT in the 1960s. We held in *Southern* that microscopic hair comparison was not novel because hair sampling with a microscope had been done for decades. *Southern*, ¶ 59. Likewise, a PBT or PAST using fuel cell technology does not represent a novel scientific technique that requires a court to apply the *Daubert* factors.

¶24 Further, Damon did not challenge the efficacy of the procedures used by the officer who administered the test and he did not challenge the adequacy of the administrative regulations underpinning those procedures. He only disputes the accuracy of the instrument's measurements in field conditions due to potential operator error and other variables not present in a lab setting. Criticisms of specific applications of procedures or concerns about the accuracy of test results do not render a scientific theory and methodology invalid or destroy its general acceptance. *State v. Ayers*, 2003 MT 114, ¶ 48, 315 Mont. 395, ¶ 48, 68 P.3d 768, ¶ 48 (citation omitted). Questions of whether specific field conditions or protocols render the results of the Alco-Sensor III unreliable go to the weight of the evidence and not to its admissibility. *State v. Weeks* (1995), 270 Mont. 63, 83, 891 P.2d 477, 489 (citation omitted).

¶25 Before a PBT result may be admitted as substantive evidence, however, a court must conduct a conventional Rule 702, M.R.Evid., analysis and the test result must be demonstrably accurate and reliable and meet all other admissibility requirements. *Weldele*, ¶ 57; *Hulse*, ¶ 63; *see also Weldele*, ¶ 87 (Rice, J., specially concurring). Unlike *Weldele*, *Crawford*, and *Snell*, the State in this case presented sufficient evidence to prove the

9

reliability and accuracy of Damon's PBT result. Macquorn Forrester, responsible for research and design of the technology used by the Alco-Sensor III and chairman of the board of Intoximeters, Inc., the company that developed and manufactures the Alco-Sensor III, testified that the instrument's margin of error in the field falls in the ten percent range. Forrester also noted that the instrument repeatedly has met the higher standard of a five percent margin of error.

¶26 Damon's expert, Dewayne K. Beckner, a self-employed blood alcohol consultant from California, testified that the Alco-Sensor III is accurate and reliable only when the operator follows certain protocols. Beckner conceded, however, that the officer can overcome the instrument's limitations by following these protocols. These protocols include waiting a minimum of fifteen minutes before administering the PBT to ensure that the subject does not ingest any material orally, testing the subject twice, ensuring that all instruments have been certified and properly calibrated, training and certifying the administering officer, and considering the effect of temperature and other variables on the result. He further contended that the instrument lacks various safeguards, such as the ability to detect mouth alcohol, but he did not dispute that the instrument's margin of error in field tests falls in the ten percent range.

¶27 The officer in the case measured Damon's BAC at 0.274. This value represents more than twice the legal limit of intoxication, which still stood at 0.10 at the time of Damon's offense. Section 61-8-401, MCA (2001). The PBT's ten percent margin of error places Damon's BAC within the range of 0.247 to 0.301. Once again, Damon did not challenge the PBT's ten percent rate of error in the field and his expert, Beckner, conceded that the

Alco-Sensor III achieved this level of accuracy in the field. Damon further acknowledged that the State followed all current testing protocols set forth in the administrative regulations, one of which requires all PBT's to meet a ten percent rate of error. *See* Rule 23.4.213(1)(b), ARM. We conclude in light of these factors that the State met its burden in this case of establishing the accuracy and reliability of Damon's PBT result in showing that his BAC exceeded the then legal limit of 0.10. Thus, the District Court did not abuse its discretion in admitting the results of Damon's PBT.

¶28 Cross-examination provided Damon ample opportunity to address his concerns regarding the effect of field conditions on the PBT result. We adhere to our settled principle of admitting relevant scientific evidence in the same manner as other expert testimony and allowing its weight to be attacked by cross-examination and refutation. *Ayers*, ¶ 48. Thus, we reaffirm our central holding in *Barmeyer*, that "it is better to admit relevant scientific evidence in the same manner as other expert testimony and allow its weight to be attacked by cross-examination and refutation." *Barmeyer*, 202 Mont. at 193-94, 657 P.2d at 598. And since Damon admitted that the officer in this case followed the existing protocols as delineated by the administrative regulations and chose not to challenge the regulations themselves, we will not address Damon's argument that the PBT result proved unreliable due to improper field protocols. Accordingly, we leave for another day the efficacy of those administrative regulations.

¶29 Finally, the dissent mistakenly characterizes this decision as an "about-face in our jurisprudence." Dissent, ¶ 64. Though the dissent may complain that the result in this particular case differs from our earlier PBT admissibility cases, it may not genuinely claim

11

that we have changed the applicable law. Here we applied the same standards used in our earlier cases, but found that in this instance the State had satisfied its evidentiary burden and the District Court had not abused its discretion in admitting the PBT. We expressly anticipated today's result in our earlier cases. *See Weldele*, ¶ 57 ("This is not to say that we will never approve trial admission of this evidence."). Moreover, today's decision does not render PBT evidence admissible "as a matter of law," *see* Dissent, ¶ 63, any more than our decisions in *Weldele, Crawford*, and *Snell* barred such admission as a matter of law.

## ISSUE TWO

¶30 Whether the District Court abused its discretion in admitting evidence of certain statements that Damon made to police during an investigatory stop in spite of the officer's failure to recite the advisories required by § 46-5-402(4), MCA (2001).

¶31 Section 46-5-402, MCA (2001), the so-called "stop and frisk statute," which the Legislature repealed in 2003, provided that before questioning a person, an officer had to inform the person of the nature of the stop. In fact, the officer had to inform the person that the officer was a peace officer, that the stop was not an arrest, but rather a temporary detention for an investigation, and that upon completion of the investigation, the person would be released if not arrested. Section 46-5-402(4), MCA (2001).

¶32 Damon contends that the District Court should have suppressed all of the statements that he made to the investigating officer due to the officer's failure to recite the advisories for investigative stops required by § 46-5-402(4), MCA (2001). Damon relies exclusively on our opinion in *State v. Krause*, 2002 MT 63, 309 Mont. 174, 44 P.3d 493. The State concedes that the officer failed to recite the advisories, but claims that the District Court's

12

ruling complied with *Krause* because Damon spontaneously uttered the statements "just give me a DUI," and "I'm already drunk," without any prompting by the investigating officer.

¶33 We suppressed a DUI suspect's statements in *Krause* where the defendant made the statements in response to questioning by an investigating officer before the officer had given the suspect the advisories. *Krause*, ¶¶ 30-38. We recently reiterated that an officer's questioning triggers the advisories required by § 46-5-402(4), MCA (2001). *State v. Nelson*, 2004 MT 310, ¶ 16, 323 Mont. 510, ¶ 16, 101 P.3d 261, ¶ 16. Here, the District Court properly excluded all statements that Damon made in response to questioning by the investigating officer. The record, including the officer's audiotape and videotape, reflects, however, that Damon spontaneously uttered his offending statements and that he was not responding to any specific questioning by the investigating officer. We cannot say the District Court abused its discretion when it admitted Damon's spontaneous statements.

**ISSUE THREE**

¶34 Whether the District Court's designation of Damon as a persistent felony offender fell within the parameters set by statute.

¶35 Damon raises three issues regarding his designation as a persistent felony offender. He contends the District Court arbitrarily designated him as a persistent felony offender in view of the fact that other felony DUI defendants have not been sentenced pursuant to § 46-18-502, MCA, the persistent felony offender statute. He also claims the statute is unconstitutional as applied to him. Finally, he argues that the specific felony DUI sentencing provisions of § 61-8-731, MCA, conflict with the more general provisions of § 46-18-502(1), MCA, and should preclude enhancement of his sentence.

13

¶36    Concerning the first two issues, we limit our review to whether Damon's sentence falls within the parameters set by statute. *Webb*, ¶ 8. This Court's Sentence Review Division is the appropriate avenue to address disproportionate sentence concerns. *See State v. Herd*, 2004 MT 85, ¶ 11, 320 Mont. 490, ¶ 11, 87 P.3d 1017, ¶ 11. Further, § 46-18-502, MCA, makes no distinction between or among the types of felonies to which it applies, and it does not exclude offenders convicted of DUI violations. *State v. Yorek*, 2002 MT 74, ¶ 18, 309 Mont. 238, ¶ 18, 45 P.3d 872, ¶ 18.

¶37    With respect to the third issue, this Court already determined that § 61-8-731, MCA, falls under the ambit of the persistent felony offender statute. *Yorek,* ¶ 18; *State v. Pettijohn*, 2002 MT 75, 309 Mont. 244, 45 P.3d 870. A district court possesses the authority to designate and sentence a persistent felony offender pursuant to § 46-18-502, MCA, when the underlying charge meets the definition of a felony and the State has provided proper notice of its intent to seek persistent felony offender status under § 46-13-108, MCA. *Yorek*, ¶ 18; *see also Pettijohn*, at ¶¶ 13-14. The State met both of these requirements here.

¶38    The dissent contends that *Yorek* and *Pettijohn* are not controlling because § 61-8-731, MCA, was amended in 2001. Dissent, ¶ 66. Those cases applied the pre-amendment statute. The primary difference is § 61-8-731, MCA (1999), imposed only a mandatory prison term, while the amended statute allows for treatment as an alternative to imprisonment. Section 61-8-731, MCA. According to the amended version of the statute, an offender convicted of a fourth or subsequent DUI must be sentenced to the Department of Corrections for a term of 13 months, a portion of which may be served on probation if the offender successfully completes the specified alcohol treatment program. Section 61-8-731(1)(a), MCA. Further,

14

the statute requires the district court to impose a sentence of five years, all of which must be suspended. Section 61-8-731(1)(b), MCA. In contrast, the persistent felony offender statute imposes a minimum sentence of five years, none of which can be deferred or suspended. Section 46-8-502(1), MCA. The amended statute is silent regarding the persistent felony offender statute. Section 61-8-731, MCA.

¶39 We follow the basic principle of statutory construction that "[w]here there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." Section 1-2-101, MCA. In general, the persistent felony offender statute, § 46-18-502, MCA, conflicts with all specific sentencing provisions. Indeed, by its very purpose § 46-18-502, MCA, provides penalties that are more severe, and therefore inconsistent, with specific criminal statutes. But the question is not whether the sentencing provisions of specific crimes are inconsistent with § 46-18-502, MCA. The question is whether "the underlying charge meets the definition of a felony, and the State has provided proper notice of its intent to seek persistent felony offender status." *Yorek*, ¶ 18.

¶40 Driving under the influence remains a felony following the 2001 amendments. Section 61-18-731(1), MCA. The persistent felony offender statute defines a felony as an offense "for which a sentence to a term of imprisonment in excess of 1 year could have been imposed." Section 46-18-501(1), MCA. Section 61-18-731(1)(a), MCA, provides for a prison term of 13 months. The fact that the 2001 amended version of the statute requires an offender to enter a treatment program does not alter the crime's status as a felony. Furthermore, § 61-8-731, MCA, contains no provision that makes § 46-18-502, MCA, inapplicable and we will not insert omitted terms into a statute. *Lodge Grass High School*

15

*v. Hamilton* (1994), 264 Mont. 290, 293, 871 P.2d 890, 892.

¶41    Affirmed.

/S/ BRIAN MORRIS

We Concur:

/S/ KARLA M. GRAY

/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE


Justice Patricia O. Cotter concurs and dissents.

¶42    I concur with the Court's conclusion on issues Two. As to Issue One, I strongly disagree with our conclusion that PBT results should be admitted as substantive evidence of guilt in DUI proceedings.

¶43    As acknowledged by the Court, this is not a new issue for us. In 1997, we determined in *Strizich* that the results of a preliminary breath test (PBT) (a/k/a preliminary alcohol screening test, or PAST) are just that--preliminary. In that case, we reviewed substantial testimony offered before the 1995 Legislative Session on the technological reliability of the testing instruments used by officers in the field. We concluded that "the results of a preliminary breath test . . . are not substantive evidence of the amount of alcohol present in a person's body, but instead are an 'estimate' of alcohol concentration for the purpose of establishing probable cause to believe that a person is under the influence of alcohol prior to making an arrest . . . ." *Strizich*, 286 Mont. at 12, 952 P.2d at 1372. This conclusion was based on reputable testimony that the instrument when used in the field is subject to several unpredictable variables based on physiological, instrumental, and operator-induced factors. *Strizich*, 286 Mont. at 12, 952 P.2d at 1372.

¶44    This issue was again before us in 2003. *See Weldele* and *Crawford.* In both cases, we once again determined that "preliminary breath testing in the field as it is currently

17

administered remains statistically unreliable." *Weldele,* ¶ 57. *See also Crawford*, ¶ 18. As recently as November 2004, this Court determined that a district court abused its discretion by admitting the results of a defendant's PBT. *Snell*, ¶ 38. In *Snell*, we explained that the State had "presented virtually the same evidence it did in *Weldele*, with the exception of one additional study of the Alco-Sensor III from the Idaho Department of Health and Welfare which determined, among other things, that *weekly* calibration of the instruments helps to ensure accuracy . . . ." *Snell*, ¶ 37. We noted in *Snell* that Montana calibrates its machines on a *monthly* basis. *Snell*, ¶ 37. We held in Snell that

> After a review of the record, we conclude the State failed to refer to new evidence that demonstrates the reliability of the Alco-Sensor III and we are not satisfied the evidence presented sufficiently established PAST accuracy and reliability so the State could use the PAST for more than probable cause purposes.

*Snell*, ¶ 37.

¶45    While we invited the State to present evidence at any time that establishes the scientific reliability and accuracy of the PBT results (*Weldele*, ¶ 57), in my judgment it has not done so. In fact, I would conclude that the evidence introduced in this case reaffirms the conclusions we reached in our previous decisions rejecting PBT results due to their unreliability as indicators of guilt.

¶46    In the case *sub judice*, two expert witnesses testified at length about the history, operating procedures, and, more generally, the strengths and weaknesses of the Alco-Sensor III: DeWayne Beckner (Beckner), a twenty-five year veteran of the Los Angeles County Sheriff's Crime Lab who specializes in forensic alcohol tests, testified for Damon, and

MacQuorn Forrester (Forrester), the Chairman of the Board of Intoximeter, the company that developed and manufactures the Alco-Sensor III, as well as other alcohol detection instruments, testified for the State.

¶47 Beckner initially noted the distinction between an instrument used for "probable cause purposes" and one used for "evidentiary purposes." He explained that when using an instrument for probable cause purposes, the operator is merely getting a preliminary assessment of the subject's condition to aid him or her in determining whether the subject might be intoxicated. On the other hand, with reference to any instrument to be used for evidentiary purposes, he said: "You are determining to a very precise concentration the alcohol content of your subject's breath or blood; and you're recording this data; you're complying with whatever regulations that might exist in your jurisdiction; you're using the highest scientific protocols available; and you are doing it all under the umbrella of properly administered scientific tests."

¶48 Beckner opined that the Alco-Sensor III, which "was designed for preliminary alcohol screening purposes," was certainly acceptable as a "probable cause screener," but that to use it as an "evidentiary instrument" would require applying the same criteria to the collection of data and training of operators as applied to evidential instruments (*e.g.*, Intoxilyzer 5000). He pointed out that evidentiary station-based instruments, such as the Intoxilyzer 5000, generally cost between $5,000.00 and $6,000.00 while the Alco-Sensor III costs approximately $500.00. Beckner stated that the significantly more expensive instruments

provided a much greater level of reliability because the machines contain substantially more sophisticated technology.

¶49 Beckner provided examples of some of the controls available in the station-based units that are not available in the hand-held units. He noted that white bread in the mouth of a subject could render a positive reading in an Alco-Sensor III unit because of the yeasts and compounds contained in the bread. He explained, however, that infrared station-based instruments have the capacity to look for organic compounds that could interfere with Alco-Sensor III readings, such as acetones, ketones, acyl aldehydes, and many others. He also testified that the more sophisticated stationary machines detect the presence of "mouth alcohol" and render an invalid test until such mouth alcohol dissipates. He stated that while officers are instructed to conduct Alco-Sensor field tests only after a minimum fifteen-minute deprivation time to avoid an inaccurately high reading based on the presence of mouth alcohol, some officers fail to do so. He also testified that for some people with dental appliances or other dental conditions, fifteen minutes is an inadequate time to eliminate the risk of measuring mouth alcohol. As a result, these persons when tested exclusively on the Alco-Sensor III without the safeguard of mouth alcohol detection, may get an incorrect high test result.

¶50 Beckner also attributed greater reliability to the station-based units because they are not portable and, therefore, are not subject to the stresses of portability. He explained that many of the Alco-Sensor units used by California officers are subject to very rough handling--they are left on top of patrol cars, they are dropped, damaged, "bounced around" in a squad

car and stored inappropriately. He maintained that such treatment affects the reliability and calibration of these instruments.

¶51 Further according to Beckner, once an instrument is out of calibration, it should not be used. He explained that most modern instruments have software that prohibits the instrument's use when it is out of calibration but "if the calibrations are done manually, and it's up to a human being to check the value of the calibration versus the value of the standard, then it can be a problem." He testified that the Alco-Sensor III must be calibrated manually. He also offered that as the fuel cells within the Alco-Sensor III instruments age, they become less sensitive and less reliable.

¶52 Beckner testified that both environmental conditions and operator practices in the field can influence the results of an Alco-Sensor III test. He reported that while ambient temperature generally is not a problem, residual condensation could occur when an instrument is used in "very, very cold" ambient air. He stated this could cause a "dramatically" inaccurate reading. As an example, he explained that a person could "be an .08 when [they were in reality] a .00." Under these circumstances, to guarantee an accurate reading, the operator would have to warm the unit or run "air blanks" through it.

¶53 As for operator-controlled factors, he pointed out that an officer could do a "manual" capture of a subject's breath rather than waiting for the instrument to complete the "automatic capture" and this could cause an inaccurate test result. This could occur intentionally as a result of impatience or inadvertently due to the stress of the situation in which an officer finds himself or herself. Another source of operator error is failure to

utilize an instrument's capability to record and store information and later download it to validate the date, time and test result. Beckner stated that many officers "merely write down what they claim to have seen, and then the evidence disappears, as opposed to collecting the evidence, memorializing it, and validating that it actually occurred." Beckner believed that most officers honored the fifteen-minute deprivation time and the absolute rule of using a new, dry, clean mouth piece for each test, but recognized that failure to adhere to this strict protocol would affect the test results.

¶54 Beckner stated that, if he was going to use PBT results for evidentiary purposes, an element of his strict protocol would be to take at least two samples. He claimed he would never use a single PBT result for evidentiary purposes. He explained that "evidence sampling variation" is frequently a factor, meaning that a second PBT sample taken two minutes after the first sample will commonly reveal a .02 and .03 difference. He asserted that tests in a crime lab to be used for criminal prosecution would never go out without a confirmatory test attached to it and that frequently such tests are done "two or three or four" times to make sure they are right.

¶55 Beckner noted that the Alco-Sensor III in a pristine laboratory is very accurate, but once it is taken outside to the field, "that's where the uncertainty start[s] to creep in to how accurate the reading may or may not be." Beckner further testified that Montana's protocols on the use of the Alco-Sensor III "need to be tightened up," and that Montana is not using "really high level protocols." For example, Montana does not require the taking of more than one sample.

¶56    MacQuorn Forrester, who bought Intoximeter from his father more than forty years ago, testified for the State. Much of his time during these decades was spent in the research and development department. He testified at length about the history of the Alco-Sensor III technology and proper operating procedures. Forrester stated that training and good observance of procedures is "essential" to the accurate operation of the Alco-Sensor III. He opined that 99% of inaccurate readings were the result of operator error, or what he called "the human element." He recognized that there are times when a field sample will deviate beyond the acceptable 10% margin of error. Examples he provided to explain such a deviation were the "incompetence level of a police officer . . . [or] the vindictiveness of a police officer that's been spit on." Forrester also pointed out a number of operator errors that could result in inaccurate readings, including, but not limited to, using the machine when its fuel cell is too cold, using the machine too many times in a short period of time, communicating through a police radio transmitter during a test, and not allowing an appropriate deprivation time before drawing a breath sample.

¶57    Notably, Forrester candidly admitted that there have been no recent technological advances to the instrument that would render it more accurate or reliable under field conditions. To the contrary, Forrester testified when asked if the company has made any technological changes since 1980 that would render the instrument more accurate, "Not the accuracy, but . . . it may be a little faster in response. . . . But not in terms of the analytic process, the outcomes to come up with the final reading, no. The sampling system is identical."

¶58 Forrester acknowledged that while there have been substantial changes to the Alco-Sensor III operation manual, these changes were the result of criticism from law enforcement agencies, as opposed to being the result of any advances in science. An example of such a change was that in an earlier manual the company recommended, "Where important evidence is being collected, . . . a standard [should] be run prior to a test to establish the accuracy of the unit for the day." According to Forrester, this recommendation was removed from the manuals because states "regulate the process." In essence, Forrester admitted that operating instructions will vary from state to state, and that these altered protocols have not been independently evaluated or subjected to peer review. It is therefore impossible to say with any degree of objective certainty whether the procedures governing use of the instrument, as revised in Montana or elsewhere, have enhanced or diminished the instrument's reliability.

¶59 No doubt this complete lack of inherency is part of the reason that the vast majority of states still exclude the results of the PBT or PAST as evidence of guilt. While the District Court found, based on Forrester's unsupported testimony, that "the Alco-Sensor III is used exclusively in at least 17 other states," an actual study of the 50 states' use of this instrument (per *Amicus Curiae* Montana Association of Criminal Defense Lawyers "Summary of PBT Rules, By Grounds") reveals that only five states allow Alco-Sensor III test results to be admissible as substantive evidence of guilt. And in general, the states that allow such test results for evidentiary purposes impose more stringent protocols than does Montana.[1]

---

[1] Arizona requires, among other things, that a confirmatory duplicate test be performed. A.R.S. § 23-1323; California requires an accuracy test of the instrument every ten days or every 150 tests, whichever is sooner. 17 Cal.Admin. Code § 1221.4; Idaho requires that the test be conducted in accordance with specified methods and that

24

¶60    As we noted in *Weldele* and *Crawford,* jurors are inclined to give more weight to evidence that is presented under the imprimatur of science than to non-scientific evidence. *Weldele*, ¶ 55, *Crawford*, ¶ 18.  *See also State v. Weaver,* 2005 MT 158, ¶ 43, ___ Mont. ___, ¶ 43, ___ P.3d ___, ¶ 43 (Cotter, J., dissenting).   A numerical value from a machine, served up with a decimal point, is a known quantity that jurors can grab onto; it easily beats the amorphous concept of reasonable doubt.   This tendency to accept scientific data is especially significant in a DUI case because the statistical result is literally the difference between a determination of guilt or innocence.   While in other types of cases, scientific results may have relative or comparative value, in DUI cases, the result has absolute repercussions.   The law establishes a definitive bright line between criminal guilt and innocence at a .08 intoxication standard.   As we stated in *Weldele*, "[b]ecause the statistical result of such a test could upon admission at trial determine guilt, the test result must be demonstrably accurate." *Weldele*, ¶ 57.   While it is frequently necessary to accept a "margin of error" percentage when utilizing quantifying instruments, the margin of error currently attributed to the Alco-Sensor III in combination with the possible inaccuracies attendant to its portability and use in field conditions simply render the machine too unreliable for use in establishing criminal guilt, especially when the more accurate and reliable Intoxilyzer 5000 is readily available.

---

an accuracy test is performed every seven days.  *State v. Smith* (Id. App. 1997), 947 P.2d 1007 and *Snell*, ¶ 37; Ohio requires weekly calibration, Ohio Admin. Code § 3701-53-04.

¶61 I am very concerned that acceptance by this Court of PBT results will lead to a reduced use, if not the extinction, of the more reliable and accurate infrared machines such as the Intoxilyzer 5000. Obviously, the Alco-Sensor III is small, portable and cheap. It is easy to use, the protocols are more relaxed than are the Intoxilyzer 5000 protocols, and the results are readily available. Under the Court's decision, Intoxilyzer 5000 test results will be at best superfluous, and at worst, an outright inconvenience when at odds with the PBT. It will simply be more expedient to do away with the Intoxilyzer test altogether. And with the demise of the Intoxilyzer test will come the demise of the guarantees of accuracy we used to require in cases such as this.

¶62 As a result of our decision the results of the Alco-Sensor III PBT will now be admitted as a matter of law in future DUI cases. There will be no argument about the obvious inherent unreliability of the instrument; there will be no testimony from experts like DeWayne Beckner; there will be no *Daubert*[2] hearings--we have settled the issue of admissibility once and for all.

¶63 At best, and assuming it even occurs to the accused's attorney to do so, defense counsel will be able to subpoena the administering officer and the authorities who maintain and calibrate the PBT instrument so as to challenge its use and operation in the particular field setting of the case. Experience teaches, however, that this sort of attack will not be effective. Trial courts will admit the PBT evidence because we have said it is admissible, its scientific validity having now been decreed as a matter of law. That is all that will matter.

---

[2] *See, State v. Clifford*, 2005 MT 219, ___ Mont. ___, ___ P.3d ___, (Nelson, J., concurring).

¶64 Given the litany of factors identified by experts for *both* sides that underscore the unreliability of the results obtained from the Alco-Sensor III PBT, I am at a loss to understand why we feel so constrained to buck the well-reasoned national trend and admit these results as substantive evidence of guilt. Nothing has changed since *Strizich, Weldele, Snell* or *Crawford* to deem these machines magically more trustworthy than they were just a few short months ago, or to justify this about-face in our jurisprudence. I therefore dissent.

/S/ PATRICIA O. COTTER

Justice James C. Nelson joins in the concurrence and dissent of Justice Patricia O. Cotter.

/S/ JAMES C. NELSON

Justice James C. Nelson dissents.

¶65 I concur in our decision as to Issue Two; I join Justice Cotter's dissent as to Issue One; and I dissent from our decision in Issue Three.

¶66 As to this final issue, the Court concludes that the District Court possessed authority to designate and sentence Damon as a persistent felony offender (PFO) pursuant to § 46-18-502, MCA (2001). The Court relies on our decisions in *State v. Yorek*, 2002 MT 74, 309 Mont. 238, 45 P.3d 872, and *State v. Pettijohn*, 2002 MT 75, 309 Mont. 244, 45 P.3d 870. I disagree with the Court's decision. Neither *Yorek* nor *Pettijohn* are authority for our decision.

¶67 It is well established in Montana that a district court has no power to impose a sentence in the absence of specific statutory authority. *State v. Hatfield* (1993), 256 Mont.

27

340, 346, 846 P.2d 1025, 1029; *State v. Nelson*, 1998 MT 227, ¶ 24, 291 Mont. 15, ¶ 24, 966 P.2d 133, ¶ 24.

¶68    In the case at bar, Damon's offense was committed on December 8, 2002. We have held that the law in effect at the time of the commission of a crime controls as to the possible sentence. *State v. Stevens* (1995), 273 Mont. 452, 455, 904 P.2d 590, 592 (citing *State v. Azure* (1978), 179 Mont. 281, 282, 587 P.2d 1297, 1298). Therefore, in this case, the 2001 version of the Montana Code Annotated sentencing statutes are applicable to Damon's sentence.

¶69    In 1999, the DUI sentencing statute, § 61-8-731, MCA, provided that a defendant convicted of a felony DUI be sentenced to between six and thirteen months of imprisonment, with no possibility of a suspension of sentence or parole in the first six months, to be followed by one to four years of probation. This statute did not cross-reference the general criminal sentencing statutes, except to provide reference to conditions the court could impose during the probationary period. This statute did not make any reference to the PFO statute. In *Yorek*, where the 1999 version of the DUI sentencing statute governed, we held that the Defendant could be sentenced as a PFO, even though his underlying felony was a DUI. *Yorek*, ¶ 22. In doing so, we held that a district court derives specific authority in a felony DUI case for designation of a PFO status from §§ 46-18-501 and 502, MCA (1999). *Yorek*, ¶ 17. Further, we explained that the 1999 PFO statutory provisions did not make a distinction between the types of felonies to which they apply and did not exclude offenders convicted of DUI violation. *Yorek*, ¶ 18.

¶70 In *Pettijohn*, where the 1999 version of the DUI sentencing statute also governed, we relied on *Yorek* in reaching the same conclusion. *Pettijohn*, ¶¶ 11-14.

¶71 Subsequent to commission of the offenses at issue in *Yorek* and *Pettijohn*, the 2001 Legislature changed the DUI sentencing statute. Although § 61-8-731, MCA (2001), still declared that a fourth or subsequent DUI was a felony, contrary to the 1999 statute, the 2001 statute provided that

> the person is guilty of a felony and shall be punished by:
>     (a) sentencing the person to the department of corrections for placement in an appropriate correctional facility or program for a term of 13 months. The court *shall* order that if the person successfully completes a residential alcohol treatment program operated or approved by the department of corrections, *the remainder of the 13-month sentence must be served on probation*. The imposition or execution of the 13-month sentence may not be deferred or suspended, and the person is not eligible for parole.
>     (b) sentencing the person to either the department of corrections or the Montana state prison or Montana women's prison for a term of not more than 5 years, *all of which must be suspended, to run consecutively to the term imposed under subsection (1)(a)*; . . . .

Section 61-8-731, MCA (200l) (emphasis added).

¶72 It is blackletter law that in the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted. Section 1-2-101, MCA.

¶73 Under the plain language of § 61-8-731(1)(a) and (b), MCA (2001), the Legislature intended to replace the mandatory imprisonment provision of the 1999 statute with a provision allowing for alcohol treatment by way of a program operated or approved by the Department of Corrections. Additionally, the Legislature specified that if the convicted person completes the specified alcohol treatment program, then the remainder of his or her

DUI sentence *must* be served on probation. Further, any sentence beyond the thirteen month sentence can not be more than five years, *must* be suspended, and must run consecutively to the thirteen month sentence.

¶74 While the 2001 statute does not reference the PFO statutes, the Legislature did change the 2001 statute to specifically include other sections of the criminal sentencing statutes. Section 61-8-731(6), MCA (2001), specifically states that the provisions of § 46-18-203, MCA (2001) (dealing with revocation of a suspended or deferred sentence); § 46-23-1001 through § 46-23-1005, MCA (2001) (dealing with the supervision of probationers and parolees); § 46-23-1011 through § 46-23-1014, MCA (2001) (further dealing with the supervision of probationers, and dealing with arrest for probation violations); and § 46-23-1031, MCA (2001) (dealing with a probationer having to pay supervision fees while on probation), apply to persons sentenced pursuant to § 61-8-731, MCA (2001).

¶75 Furthermore, a review of the legislative history makes it clear that the Legislature did not intend for persons convicted of DUIs committed on or after July 1, 2001 (the effective date of the 2001 changes), to be incarcerated for long periods of time. Senator Lorents Grosfield sponsored the changes in the DUI sentencing statute with the goal of reducing recidivism of offenders by having such persons attend treatment programs rather than undergo more incarceration in prison. Senate Judiciary Comm. Minutes, Feb. 19, 2001; House Judiciary Comm. Minutes, March 28, 2001.

¶76 Additionally, proponents of amending the statute included the health services manager from the Department of Corrections and the Montana Medical Association. Senate Judiciary Comm. Minutes, Feb. 19, 2001.

¶77 Finally, the preamble to Chapter 417, Laws of Montana 2001, provided as follows:

> WHEREAS, the incidence of fourth or subsequent convictions for driving under the influence of alcohol has not abated despite the threat of imprisonment; and
> WHEREAS, alcoholism may be treatable with the appropriate level of intensive therapeutic programming; and
> WHEREAS, a program of intensive residential alcohol treatment may reduce recidivism by persons who drive under the influence of alcohol.
> THEREFORE, the Legislature finds that it is in the interests of public health and safety to establish a residential alcohol treatment program.

This preamble demonstrates that the Legislature intended to provide treatment for persons convicted of DUIs, and not extended imprisonment.

¶78 It is well established that when the Legislature amends a statute we presume that the Legislature meant to make some change in the existing law. *State ex rel. Mazurek v. District Court of the Twentieth Judicial District*, 2000 MT 266, ¶ 18, 302 Mont. 39, ¶ 18, 22 P.3d 166, ¶ 18; *Mitchell v. Banking Corp. of Mont.* (1933), 95 Mont. 23, 27, 24 P.2d 124, 125.

¶79 Under the 1999 version of § 61-8-731, MCA, as interpreted in *Yorek* and *Pettijohn*, a person could be declared a PFO for felony DUI, and the 1999 version of the statute provided for mandatory imprisonment of such an offender. To the contrary, however, the 2001 amendment abolished the provision for mandatory imprisonment, replacing it with a provision that allowed for treatment as an alternative to imprisonment. Under the rules of statutory construction, we must honor the Legislature's decision to substantially revise

31

§ 61-8-731, MCA, rather than blindly adhering to our previous interpretation which was rendered when this statute contained altogether different language. We must recognize the Legislature's manifest preference for alcohol treatment. Declaring Damon a PFO does not honor that legislative preference, and, indeed, flies in the face of the Legislature's stated intention in amending the statute in 2001.

¶80 While the Court pays passing deference to the rules of statutory construction, it ignores one of the most fundamental of these rules. Section 1-2-102, MCA, provides:

> **Intention of the legislature – particular and general provisions.** In the construction of a statute, the intention of the legislature is to be pursued if possible. When a general and particular provision are inconsistent, the latter is paramount to the former, so a particular intent will control a general one that is inconsistent with it.

As pointed out above, the 2001 Legislature clearly intended that persons convicted of felony DUI be treated, rather than punished with long prison terms. Nothing could be clearer from the preamble and legislative history of § 61-8-731(1)(a) and (b), MCA (2001). The Legislature's intent derived from its discovery that long prison terms and the threat thereof had been and were not effective in dealing with recidivist DUI offenders.

¶81 Our rationale, expressed in ¶¶ 39 and 40, ignores this clear legislative intent. Contrary to what the Legislature had in mind, we conclude that lengthy incarceration under the PFO statute should trump treatment. We offer no principled basis why the Legislature's clear intent should not, here, be *pursued if possible* as § 1-2-102, MCA, requires. Indeed, the Court turns the first sentence of § 1-2-102, MCA, on its head. We make no attempt to pursue the Legislature's intent. Rather, we simply substitute our own.

¶82 In like fashion, the Court summarily rejects Damon's argument that the specific DUI sentencing statute controls over the general PFO statute, thereby ignoring the balance of § 1-2-102, MCA. Nonetheless, this argument is sound because the imprisonment provisions of these two statutes are in direct conflict with each other.

¶83 The PFO sentencing statute mandates that when a district court requires a PFO to serve time in prison, the time of imprisonment must not be less than five years. Section 46-18-502(1), MCA (2001). Further, the statute specifies that this minimum five year term of imprisonment may not be deferred or suspended. Section 46-18-502(3), MCA (2001). The applicable DUI sentencing statute, however, mandates that when a district court hands down a prison sentence pursuant to a defendant's fourth or subsequent conviction, that sentence must be exactly thirteen months. Section 61-8-731(1)(a), MCA (2001). Further, a portion of this thirteen month sentence may be served on probation if the repeat DUI offender successfully completes a specified alcohol treatment program. Section 61-8-731(1)(a), MCA (2001). Finally, this statute also mandates that the district court impose a sentence of five years--all of which time *must* be suspended. Section 61-8-731(1)(b), MCA (2001). Thus, the plain language of the DUI sentencing statute directly conflicts with the plain language of the PFO sentencing statute. Moreover, as noted above, the legislative purpose and spirit behind each statute are in direct conflict. In place of extended prison sentences, the DUI sentencing statute provides for treatment based on legislative acknowledgment that the threat of imprisonment has failed to deter DUIs.

¶84   As the blackletter law requires, when a general statute and a specific statute are inconsistent, the specific statute must govern, so that a specific legislative directive will control over an inconsistent general provision. *State v. Feight*, 2001 MT 205, ¶ 21, 306 Mont. 312, ¶ 21, 33 P.3d 623, ¶ 21 (citing *In re Marriage of Jones* (1987), 226 Mont. 14, 16, 736 P.2d 94, 95). In *Feight*, we stated:

> [I]t is a well-settled rule of statutory construction that the specific prevails over the general. A particular statutory intent controls over a general one which is inconsistent with it. Section 1-2-102, MCA. Further, when two statutes deal with a subject, one in general and comprehensive terms, and the other in minute and more definite terms, the more definite statute will prevail to the extent of any opposition between them.

*Feight*, ¶ 21.

¶85   The specific statute is § 61-8-731, MCA (2001), because it applies only to felony DUIs. The PFO statute, § 46-18-502, MCA (2001), is the general statute because it applies to unspecified felonies. Applying this rule of law here, we must conclude that pursuant to § 61-8-731, MCA (2001), Damon could not be sentenced to more than thirteen months of imprisonment. Thus, enhancing his sentence under the PFO statute is patently illegal under the 2001 version of the Montana Code Annotated sentencing statutes.

¶86   Finally, neither *Yorek* or *Pettijohn* control the disposition of the case at bar. Even though both decisions were handed down prior to the commission of Damon's offense on December 8, 2002 (*Yorek* and *Pettijohn* were decided April 16, 2002) both Yorek and Pettijohn committed their offenses under the 1999 version of the statute. *Yorek*, ¶ 3; *Pettijohn*, ¶ 3. Both cases were decided under the 1999 version of the statute and not the 2001 version of the statute. *Yorek*, ¶ 19; *Pettijohn*, ¶ 12. Both cases were correctly decided

34

on the basis of the 1999 version of the Montana Code Annotated. But, the law changed in 2001, rendering our decisions inapposite for offenses and sentences under the amended law. The Court's decision here refuses to recognize that.

¶87 Based on the foregoing, I would hold that the District Court lacked the legal authority to sentence Damon as a PFO under the 2001 version of § 61-8-731, MCA, and that, therefore, the District Court's sentence was illegal and must be vacated. I would reverse Damon's sentence and remand with instructions that the District Court re-sentence him in accordance with § 61-8-731, MCA (2001).

¶88 I dissent from our failure to do so.


/S/ JAMES C. NELSON


Justice Patricia O. Cotter joins in the dissent of Justice James C. Nelson.


/S/ PATRICIA O. COTTER